## BASSETT v. SALISBURY MANUFACTURING COMPANY.

If the owners of a dam on a water-course, by means of their dam obstruct the natural drainage from the land of another, to his actual injury, they are liable to him therefor, although his land is not situated upon the water-course, unless such obstruction was caused by them in the reasonable use of their own land or privilege.

What, in any particular case, is a reasonable use or management, is ordinarily a mixed question of law and fact, to be submitted to the jury under the instruction of the court.

CASE. The declaration is set forth at length in 28 N. H. 438. The writ was dated August 17, 1849.

At the trial, the plaintiff limited his claim, for the purposes of that trial only, to the damage caused by the defendants' dam to the lot of thirty-three acres, described in the declaration. The plans used on the trial were be referred to in the argument. Said lot is situated in Kingston, about half a mile from Powow river. The natural drainage of the lot, and of other adjacent swampy lands, is into the river, above the defendants' dam. The surface of the lot is higher than the ordinary level of the water in the river. The levels are shown by the plans. It was made a question whether there was any water-course on the lot.

In July, 1837, one Shilling, who then owned the lot, dug a ditch on it, about ten rods long, beginning at the line on the side nearest the river. All that part of the lot drained by this ditch was called Miry Ditch. Shilling, who was called as a witness by the plaintiff, testified concerning Miry Ditch as follows:

"There was no sign of a ditch there before I dug one. The water was within a foot of the top of the ground when I dug, and after that the ditch got nearly dry that season; dug it in July, 1837, and by the first of August it was nearly dry. I dug the ditch about ten rods up from Eaton's land; no ditch there before. I dug through blue-joint grass. The soil that I dug up was covered with grass. In a dry time I could not tell but where I dug was on a level with the land on both sides."

There was no evidence in conflict with the testimony of Shilling as to this artificial ditch. After the jury had been out nearly three hours they desired to have read to them the minutes of Shilling's testimony bearing upon the question whether there was a water-course

at Miry Ditch before he dug his ditch.  The court complied with their request, and the jury immediately returned their verdict.

The court instructed the jury as follows :

A water-course is something more than running water.  A water-course is a stream of water, usually flowing in a definite channel, having a bed and sides, or banks, and usually discharging itself into some other stream or body of water.  To constitute a water-course the size of the stream is not important.  It may be very small, and the flow of the water need not be constant, but it must be something more than a mere surface drainage over the entire face of a tract of land occasioned by unusual freshets, or other extraordinary causes ; and underground percolation is not a water-course.  A water-course may be natural, as a river or brook; or artificial, as a canal or ditch after twenty years' use.  A water-course is not to be ascertained or determined by the condition of water in a great and unusual freshet, or when raised temporarily by a dam, but it must have existed in a natural state, or after twenty years' use.

The ditch dug by Shilling was not a water-course.  Even if it would have been a water-course if dug twenty years before March 10, 1847, it was not a water-course in 1847, 1848, or 1849, because it had not then been dug twenty years; so that the question as to a water-course at Miry Ditch, is, was there a water-course there before Shilling dug the ditch, or would there have been a water-course there if he had not dug the ditch ?

The legal rights of persons through whose lands there is a water-course are definite and undisputed.  The lower owner has the right that the upper adjoining owner shall not wholly stop the stream and drain it off so that none of it can enter the land below; the upper owner has the right that the lower adjoining owner shall not perceptibly raise the height of the stream above the division line between them.  The lower one has the right that the stream shall come down into his land; the upper one has the right that the stream shall go down off his land.  These rights are mutual, corresponding, and correlative.  They are incident to water-courses, and belong exclusively to riparian proprietors.  Where there is no water-course, there are no owners of the banks of a water-course; no riparian proprietors.  And where there are no riparian proprietors the peculiar, correlative rights of riparian proprietors do not exist.

If the defendants, by their dam, threw any water back on to or into the plaintiff's lot, they are liable, whether there was a water-course on it or not.  But if they did not throw any water back on to or into his lot, it is material to inquire whether there was any water-course on it or in it.

If A owns a lot of land higher than the adjoining lot of B, and there is no water-course on either lot, but the natural, subterranean, percolating drainage is from A's into B's, A, by draining in another direction, by wells, or by any barrier or obstruction on his own land below and above the surface, along the division line between them, may prevent the water from passing into B's land; and B may dig a cellar on his lot, up to the division line, and keep the water out of it; may drain his lot and keep it dry ; may dig out his soil and make

a pond; and if, for any such purposes he does not want the drainage from A's lot, he may put a cemented wall on his own land, the whole length of the division line, so deep below and so high above the surface that no water can pass from either lot to the other. A is not obliged to let the water go down into B's land, and B is not obliged to let it come down. If there was a water-course running through their lots, neither could wholly stop it at the division line; but there being no water-course, and no correlative rights of riparian proprietors, both may stop the percolation. And B may stop the percolation across the line by water, as well as by stone, wood, or earth. For purposes of natural, subterranean, percolating drainage, or for purposes of improvement by artificial draining, where there is no water-course, A does not own the natural fall on or in B's land, but B owns it; and if B merely destroys that fall, by making his land more solid, and filling it up with other soil as high as, or higher than A's, or by filling and covering his own land with water, A has no legal remedy, if no water is thrown back upon or into his land.

If there was a water-course on or in the plaintiff's lot, and running out of it to the river, the plaintiff could not fill it up, or stop it, or drain off all the water from it in other directions, so as to wholly prevent it from going into the defendants' pond; and the defendants could not flow the water back, by their dam, so as actually and perceptibly to raise the natural level of the water in any part of the water-course on the plaintiff's lot. But if there was no such stream on or in the plaintiff's lot as the defendants had a right to have flow; if there was no such stream that the defendants could make the plaintiff pay them damages for wholly stopping it, then there was no such stream as to make the defendants liable merely for stopping it. If the plaintiff had the right to prevent all the water in his land from going into the defendants' pond, then the defendants had the same right to keep it back. If the defendants had the right that the plaintiff's land should hold water for them, and that the water should come down to them, then they had not the right to keep it back in his land.

If there was no water-course on or in the thirty-three acres, it is immaterial whether or not there was a water-course all the way or a part of the way between the thirty-three acres and the river.

The principal points in the case may be summed up thus:

I. Was there, on or between March 10, 1847, and August 17, 1849, a water-course within the bounds of the thirty-three acre lot, and running into or running out of it?

If there was, and if the defendants, by their dam, at any time during that period raised the water in such water-course on the thirty-three acres perceptibly higher than its natural level, they are liable, extraordinary freshets being excepted.

II. If the defendants, by their dam, at any time during the same period, threw any water back on to or into the thirty-three acres, they are liable, extraordinary freshets being excepted. But they are not liable for merely stopping the suface drainage, or the underground, percolating drainage, where there was no water-course.

The freshets, for the consequences of which the defendants are

not liable, are not the usual and ordinary ones of spring, or such as may generally be expected every year, but such as are unusual, extraordinary, and not to be expected.

If the plaintiff's right was infringed, he is entitled to nominal damages, even if his land was not injured, or even if it was actually benefitted by the acts complained of; and, if his right was infringed, he is entitled to such actual damages as you believe he has sustained, and interest thereon from the date of the writ.

The plaintiff requested the court to instruct the jury:

1. That the plaintiff had the right to use his land for the ordinary purposes for which such land is used, and to improve it by the usual and proper processes of husbandry, and that any obstruction by the defendants' dam of the waters of the Powow river which prevented such use, within the time alleged, rendered the defendants liable in this suit.

2. That if the defendants by means of their dam caused back water upon the plaintiff's land, or caused the water falling upon or running into the land to remain and keep the land substantially and visibly wet longer or in a greater degree than otherwise would have occurred (within the time alleged), the defendants are liable.

3. That if the plaintiff's land is a part of a large tract of swampy land which lies upon the Powow river, and is drained by said river, the defendants are liable, if (within the time alleged) they have by their dam held back the waters of said river, so as to prevent the natural drainage of the plaintiff's land, and render it substantially and visibly wetter, to his damage, although the plaintiff's land does not abut on said river, there being no land between said river and the plaintiff's land higher than his land.

4. If the defendants, by means of their dam, have actually caused back water upon the plaintiff's land, or if they have actually and perceptibly kept water upon it; or, in other words, if his land has been made and kept wetter (substantially and visibly so) than it would have been but for the dam, he is entitled to at least nominal damages, and to such actual damages as the jury may believe he has sustained.

5. If the defendants' dam, as it was kept up, caused injury to the plaintiff's land, by keeping the water upon it, whether it was the water of the Powow river or the little streams flowing into it, or that falling upon it in rains, he is entitled to at least nominal damages, and to such actual damages as the jury may believe he has sustained.

6. If a ditch in another place, or crooked and Shilling's ditch took the place of it, that is the same as if the ditch was dug in the same place.

7. A freshet such as actually occurs every spring is not an extraordinary freshet; but if the company have flowed by their dam, in such freshets, the defendants are liable.

The court declined to instruct the jury as requested.

To the instructions given, and to the refusal to give the instructions requested, the plaintiff excepted, and, a verdict being returned against him, he moved to set the same aside and for a new trial.

*H. F. French* (with whom were *Marston* and *Towle*), for the plaintiff, cited and commented on *Tyler* v. *Wilkinson*, 4 Mason 397; *Rawstrom* v. *Taylor*, 11 Exch. 369; *Broadbent* v. *Ramsbotham*, 11 Exch. 602; *Chasmore* v. *Richards*, 2 Hurls. & Norm. 168; *Dickinson* v. *Canal Co.*, 7 Exch. 282; *Acton* v. *Blundell*, 12 M. & W. 324; *Cooper* v. *Barber*, 3 Taunt. 99; *Greenleaf* v. *Francis*, 18 Pick. 117; *Ellis* v. *Duncan*, 21 Barb. 233; *Smith* v. *Adams*, 6 Paige 435; *Smith* v. *Kenrick*, 7 C. B. 515; *Whately* v. *Baugh*, 1 Casey 528; *Luther* v. *Winnisimmet Co.*, 9 Cush. 171; Ang. on Water-Courses 119; *Brown* v. *West*, 1 Wils. 174; *Arnold* v. *Foot*, 12 Wend. 330; *Parker* v. *B. & M. Railroad*, 2 Cush. 107; *Monson Co.* v. *Fuller*, 15 Pick. 554; *Palmer* v. *Ferrill*, 17 Pick. 58; *Bassett* v. *Salisbury Co.*, 28 N. H. 438.

*S. M. Wilcox* (with whom were *Christie* and *D. Clark*), for the defendant, cited and commented on *Luther* v. *Winnisimmet Co.*, 9 Cush. 174; *Greenleaf* v. *Francis*, 18 Pick. 121; *Flagg* v. *Worcester*, 13 Gray 605 (and *Parks* v. *Newburyport*, there cited); *Acton* v. *Blundell*, 12 M. & W. 348; *Chasmore* v. *Richards*, 2 Hurls. & Norm. 168 (S. C. 5 Hurls. & Norm. 92); *Dickinson* v. *Canal Co.*, 7 Exch. 282; *Rawstrom* v. *Taylor*, 33 E. L. & E. 428; *Broadbent* v. *Ramsbotham*, 34 E. L. & E. 553; *Runnels* v. *Bullen*, 2 N. H. 586; *Cooper* v. *Barber*, 3 Taunt. 99; *Dickinson* v. *Canal*, 9 E. L. & E. 520; *Parker* v. *B. & M. Railroad*, 2 Cush. 107; *Monson Co.* v. *Fuller*, 15 Pick. 554; *Palmer Co.* v. *Merrill*, 17 Pick. 558; *Balston* v. *Benstead*, 1 Camp. 463; *Tyler* v. *Wilkinson*, 4 Mason 397; *Dexter* v. *Providence Co.*, 1 Story 387; *Ellis* v. *Duncan*, 21 Barb. 236; *Whately* v. *Baugh*, 25 Penn. 528; *Chatfield* v. *Wilson*, 28 Vt. 459; *Smith* v. *Herrick*, 62 E. C. L. 514; *Roath* v. *Driscoll*, 20 Conn. 533; *Thurston* v. *Hancock*, 12 Mass. 220; *Panton* v. *Holland*, 17 Johns. 92; *Bassett* v. *Salisbury Co.*, 28 N. H. 438.

BARTLETT, J.   No land-owner has an absolute and unqualified right to the unaltered natural drainage or percolation to or from his neighbor's land.   In general it would be impossible for a land-owner to avoid disturbing the natural percolation or drainage, without a practical abandonment of all improvement or beneficial enjoyment of his land.   Any doctrine that would forbid all action of a land-owner, affecting the relations as to percolation or drainage between his own and his neighbors' lands, would in effect deprive him of his property; and so far from being an application of the maxim, " *cujus est solum,*" &c., would work a general denial of effect to it.   If A has the absolute and unqualified right to receive from and discharge into the adjoining land of B all the drainage and percolation, as they naturally flow between that land and his own, this is substantially a right to a use of B's land, practically depriving the latter of all beneficial enjoyment of his property, and in effect amounting to an appropriation of it; and as B and the other neighboring land-owners must have similar rights, the improvement, or beneficial occupation of land, becomes in fact impossible, and property in the soil for nearly all useful purposes is annihilated.   But we do not think it follows from this, as some recent cases have held, that a

land-owner has the full and unlimited ownership, and the absolute and unqualified right of control of all water in or upon his land not gathered into natural water-courses; for the non-existence of an absolute right does not conclusively disprove the existence of a qualified right. Nor do we think that the maxim cited can be applied to establish an unqualified ownership of such waters in all cases, any more properly than it can be relied on to prove an absolute property in all the air within one's bounds. If the land-owner has the absolute and unqualified ownership of all such water in or upon his land, his neighbor, by digging or otherwise, has no more right to take away his property water than his property sand. If, as respects the soil, he may dig as he pleases, he is still in general limited by the rule that in digging he must not take away his neighbor's soil by effectually removing its natural supports. If a natural pond, of uniform depth, is equally divided between two land-owners, or if they have dug a well, half on the land of each, it perhaps would not be claimed that one may pump his half of the pond or well dry, without regard to the half of his neighbor. But however this may be, if the water, not gathered into natural water-courses, belongs absolutely to the owner of the land, because it is part of the soil, and for that reason only, it must be subject to the same law as the other components of the soil; the sand, loam and rock; which may not ordinarily be removed by an adjacent owner by the withdrawal of their natural supports; for the maxim from which such ownership is deduced, when applied without qualification, as it must be to lead to this conclusion, allows no sound distinction.

But such a doctrine would lead to exactly the same mischiefs that have caused the rejection of that first discussed; it would prevent all improvement or beneficial enjoyment of land in precisely the same way. To be sure, the language and the doctrines of some of the cases would seem to allow the land-owner not only all the water in his land, but all he can draw thither; but such a rule, it seems to us, is in direct conflict with the principle upon which the theory is founded, and must lead in many cases to an interminable struggle for possession or removal of waters in the soil. Indeed, we do not know of any decision that perfectly carries out this doctrine of absolute ownership to its logical result; but, so far as we are aware, the cases maintaining it go no further than the somewhat illogical view last suggested; probably because of the entire incompatibility of the former with any beneficial use of land. But this departure from the principle upon which they found their theory does not seem to us to have saved them from difficulty or inconsistency. Nor do we think a sufficient foundation for this doctrine of absolute ownership can be found in the alleged difficulty of determining the direction and extent of percolation and drainage. In a large number of cases no such difficulty exists, and the remainder may be provided for consistently, and in accordance with settled legal principles. We need not examine the argument as to the nonexistence of a presumed grant, drawn from this alleged difficulty, for we do not understand the theory of our law of water-courses to rest upon any such foundation; nor need we inquire whether some of

the cases which use the.term "common consent," in treating of the supposed origin of aquatic rights, may not have confounded that with the doctrine of presumed grants which could come from particular persons only in any given case.

If this doctrine of absolute ownership is not well founded in legal principles, certainly there is nothing in its practical operation that so commends it to our approval as to lead to its adoption. It must, if held as in several cases, leave every where a conflict of right and enjoyment, irreconcilable in law or in fact; and however held, it will, in a variety of cases, lead to incalculable mischiefs. Logically followed out, this doctrine, if confined to the water naturally in or upon the land, would forbid almost all interference by each landowner with his own land; or if applied to all the waters found in or upon the land not gathered into natural water-courses, would take away all remedy for malicious acts in relation to them. But the injustice of the latter result has led to an exception in several jurisdictions, that seems anomalous under the theory they adopt. As already suggested, we are not aware that any of the cases have followed this doctrine of absolute ownership rigidly to its logical conclusion, so as to forbid all interference with another's property water, situate in his land; but even when not pursued so far, it gives rise to other inconsistencies. If A owns a tract of land upon the westerly bank of a river, he may maintain an action against B, who, by obstructing the river, throws its waters into his soil throughout its whole extent, unreasonably, and to his injury, and recover for the entire damage; else we must hold that A can only recover for the injury to the film of soil in immediate contact with the water-course, and for the raising of the water in the channel over his land; and we can see no legal distinction in this respect between throwing water into or upon another's soil. But if A sells to C the easterly half of his land, he loses all remedy for the continuance of the same injury to the residue of his land; or, if he sells to C the westerly half, C can have no remedy for the same injury, since the water only percolates through the land of A. Or if a distinction is asserted between the water of the river and the water in the soil in such case, suppose B, instead of throwing the water of the river itself into C's land, by unreasonably obstructing the stream, forces the river water into the land of A, and thereby drives from the latter's land into the land of C an amount of water precisely equal to that first supposed, producing exactly the same injury to it, is C to be without remedy, where the injury is the same, produced in the same general way, and by the same cause, because of a difference, not in the nature or effects of the water, but merely in its immediate and not necessarily its ultimate source? Such distinctions and such results do not commend themselves to our judgment. Upon this theory you can have no more right to remove from your neighbor's land a film of water than a film of clay, for both are equally and absolutely his property. It can not be held that you have the right to dig as you please upon your own land near a neighbor's well, provided "the last rib of earth" that holds the water is not removed, even though the effect of the operation may be to drain the well by percolations, for upon this

theory why the proviso?  Practically the same result is reached in either case; and if the proposition were correct, it would follow that here the law allows indirectly what it forbids directly. If the prohibition has any reason, it is the preservation of the neighbor's well; or, in other words, of his water in it, for that is its only valuable purpose. And this reason is equally applicable in either case. We think that no foundation for such a distinction can be found in the law. If the last rib of earth is yours, you may, upon this doctrine, remove it because it is yours, and because of your right to do as you please with your own; and any denial of your right, in such case, because of your neighbor's well, strikes at the foundation of the whole theory. If it is your neighbor's, you have no right to remove it, solely because it is his, and not because it confines the water in his well. It is to be observed, however, that the allowance of the removal of the last rib of earth in such case, when it belongs to yourself, disregards the absolute rights given to the neighbor by the same theory, quite as much as the denial of that right would disregard your own.

It seems to us inconsistent to hold that ordinarily you may not drain a water-course by digging away the bank, which is your land, and yet to sustain a doctrine which would allow you to dig so near it as to draw off all its water by percolation. In either case you deal directly with your own merely; but in the former you are forbidden, only because by so doing you take what is not absolutely your own; because you drain a water-course. This is the sole and the sufficient reason. In the other case exactly the same reason exists for not doing a similar act, producing precisely the same effects, that constitute the only objection in the former, and therefore the law of the cases should be the same; and it would seem to follow that ordinarily you may not. drain a water-course dry by means of percolation into your pits. Although the law does not generally allow one directly to deprive the land-owners below of the natural advantages of a common water-course, yet this doctrine, as held in some of the cases, would sometimes permit this mischief indirectly, by allowing all the sources of supply to be cut off from the stream.

But it is unnecessary to multiply examples or follow the doctrine in its varied applications; for we think enough instances have been selected to show the nature of the difficulties attendant on it. The law regulating water-courses has its origin or foundation in the benefits and injuries that may arise from water; and among the former the propulsion of machinery is but one of many. These benefits and injuries may often be quite similar in cases of underground and surface drainage, and of drainage by water-courses. In such inquiries the ultimate source of the water is never regarded; and the immediate source seems to us equally immaterial, since it in no way changes the nature or effect of the water; and the regulations now settled by the law of water-courses were established, not because of any peculiarity in the origin of water in streams, but because of the good or harm that may result from its management or use. Therefore, so far as a similarity of benefits and injuries exists, there should be a similarity in the rules of law applied.

Whether the deposition or detention of water in or its removal from land is caused by a water-course, or by other means, can create ordinarily no difference in the effects of such deposition, detention, or removal.

We think it does not follow, as some of the cases seem to assume, that because a land-owner has not the absolute and unrestricted right of drainage to or from his neighbor's land, he has no rights of drainage whatever, and that each land-owner has the entire and unqualified ownership of all water found in his soil, not gathered into natural water-courses, in the common acceptation of that term.

There is another view entitled to consideration. If the rights are not absolute and unqualified, they are qualified, or there are no rights at all. We need not argue that some rights exist; that the owner of the land may make some use of the water in it; that he may do some acts that will affect to some extent the drainage; that a well may be dug, under some circumstances, although it will draw water by percolation from a water-course, from adjoining land, or even from the well of a neighbor. If the views we have expressed are correct, they have already indicated the sole ground of the qualification of the land-owner's right in such cases, and that is, as in certain cases of water-courses, the similar rights of others; and this will of course determine the extent of the qualification, which, as in the analogous cases suggested, and for the same reasons, is the rule of reasonable use—of a reasonable exercise of one's own right. The rights of each land-owner being similar, and his enjoyment dependant upon the action of the other land-owners, these rights must be valueless unless exercised with reference to each other, and are correlative. The maxim, " *Sic utere,*" &c., therefore applies, and, as in many other cases, restricts each to a reasonable exercise of his own right, a reasonable use of his own property, in view of the similar rights of others. Instances of its similar application in cases of water-courses, where the detention, pollution, or unnatural discharge of the water is complained of, of highways, of alleged nuisances in regard to air or by noises, &c., &c., and of the manner of the application, are too numerous and familiar to need more special mention. As in these cases of the water-course, so in the drainage, a man may exercise his own right on his own land as he pleases, provided he does not interfere with the rights of others. The rights are correlative, and, from the necessity of the case, the right of each is only to a reasonable user or management; and whatever exercise of one's right or use of one's privilege, in such case is, under all the circumstances, and in view of the rights of others, such a reasonable user or management is not an infringement of the rights of others; but any interference by one land-owner with the natural drainage, injurious to the land of another, and not reasonable, is unjustifiable. Every interference by one land-owner with the natural drainage, actually injurious to the land of another, would be unreasonable, if not made by the former in the reasonable use of his own property. Although the plaintiffs' land was not situated upon the river, yet, if the defendants, by means of their dam, obstructed its natural drainage to the actual injury of the plaintiff,

they are liable, unless the obstruction was caused by the reasonable use of their own land or privilege; and the reasonableness of the use would depend upon the circumstances of the case. What, in any particular case, is a reasonable use or management, is ordinarily a mixed question of law and fact, to be submitted to the jury under the instruction of the court.

There is no necessary conflict between these views and the cases which hold that a riparian proprietor below has in general no right to raise the water of the stream above its natural level upon the land of a riparian proprietor above. From a right to the reasonable use of one's own property or privilege, there does not usually result any right to the reasonable use of another's property or privilege. It may be that in case of such flowage the law holds the use unreasonable, or that no question of reasonableness arises, because there may exist no necessity in the case that one should be allowed thus to flow back upon the land of his *supra-riparian* neighbor similar to the necessity which requires the application of the doctrine of reasonable use in cases of the unnatural detention, discharge, or pollution, of the waters of a stream, and of drainage, in order that each proprietor should have any practically valuable enjoyment of his unquestioned right or property. But these matters are not necessarily before us here, and we do not intend to pass upon them at the present time.

In this view we encounter none of the objections that we have suggested as inseparable from the other doctrines, and it obviates some difficulties and anomalies that would otherwise exist. The law as to malicious acts ceases to form an exception to the general rule; and the cases of difficulty in the previous determination of the direction or extent of drainage are disposed of by the submission of this difficulty of determination to the jury, as one of the matters of fact bearing on the question of reasonableness. Again it is admitted that it is not essential to a water-course that the banks should be absolutely unchangeable, the flow constant, the size uniform, or the waters entirely unmixed with earth, or flowing with any fixed velocity; but the law does not and can not fix the limits of variation in these particulars. Where a water-course originates, and is supplied from a natural lake, the current in the latter may be hardly perceptible, yet it may be doubted if any one could justify the entire withholding of its waters from the stream it should feed. Indeed, it is by no means certain that the entire absence of current in a lake would prevent the application of the general principles that protect the rights of land-owners on running streams; for perhaps it will be found that owners of land upon such lakes have similar qualified rights to the enjoyment of these waters in their natural condition, and to the reasonable use of them, and may claim that the water shall not be unreasonably raised, lowered, or polluted, to their injury. If the general principles governing the use of water-courses were to be applied, so far as may be, to all water naturally percolating or draining, then the occasion for a definition in the respects first mentioned would cease in many cases; and if they were to be extended to all water that may be put in motion by operations upon

land, there then would be no call for any distinction in the principles, but only for an accurate discrimination of the facts essential to their correct application, with reference to the rights of others, and the legal necessities of the cases under their varying circumstances. But these questions are not now before us, and we do not propose to examine them here.

The views we have adopted seem to us but an extension of rules, well settled and long applied in cases of similar water rights, to a class of cases but recently brought into much discussion before courts governed by the common law; and rules which, we think, accord with many analogies of the law, and will in general work no injustice or particular hardship to those interested.

We are aware that since the case of *Acton* v. *Blundell,* the weight of authority elsewhere is against the view of the law which we have adopted. A number of cases have been cited by the defendant's counsel, and more may now be found, in which the reasoning conflicts with the conclusion at which we have arrived; but, with the highest respect for the tribunals that have pronounced those decisions, we are compelled to differ from the views they have expressed. These cases are all of recent date, and a considerable number of conflicting decisions, and several dissenting opinions, show that their doctrines have not met with uniform acceptance. It is unnecessary for us to inquire into the merits of the results reached in these cases; for though we might be satisfied with such results in particular instances, we are unable to assent to the reasoning by which they have been reached. We are not aware that the doctrine of *Acton* v. *Blundell,* and of the cases which follow it, has been adopted in any decision in this State; but so far as the subject has been considered at all here, we think our decisions have not tended in the direction of that case. See *Portsmouth Aqueduct Co.* v. *Concord & Portsmouth Railroad* (Rockingham, June term, 1860); *Bassett* v. *The Salisbury Manf. Co.,* 28 N. H. 451; *Rowe* v. *Addison,* 34 N. H. 306; *Johnson* v. *Railroad,* 35 N. H. 569. The verdict must be set aside and a

*New trial granted.*