355 So.2d 796 (1977)
CITY OF ST. PETERSBURG, Florida, a Municipal Corporation, Petitioner,
v.
SOUTHWEST FLORIDA WATER MANAGEMENT DISTRICT, an Administrative Agency of the State of Florida, Respondent.
No. 76-1435.
District Court of Appeal of Florida, Second District.
October 12, 1977.
Carl R. Linn, City Atty., and Richard D. Oldham, III, Asst. City Atty., St. Petersburg, for petitioner.
L.M. Blain and Thomas E. Cone, Jr. of Gibbons, Tucker, McEwen, Smith, Cofer & Taub, Tampa, for respondent.
J. Clint Brown and Edna Wilson of Dixon, Shear, Brown, Stephenson, Tampa, for Hillsborough County, amicus curiae.
Jacob D. Varn of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, for Pasco County, amicus curiae.
John T. Allen, Jr., St. Petersburg, W. Gray Dunlap, Clearwater, for Pinellas County, amicus curiae.
BOARDMAN, Chief Judge.
In October and December 1975 notice was published of the applications of the city of St. Petersburg, petitioner, for two consumptive water use permits requesting "the continuing withdrawal of water under regulatory levels as established by the Southwest Florida Water Management District," (SWF), respondent. The applications were for withdrawal of water from two well fields, Cosme-Odessa and Section 21, located in Hillsborough County and owned by St. Petersburg. St. Petersburg amended its applications to request specific volumes of water, that is, an average withdrawal of 19 million gallons per day (mg/d) from Cosme-Odessa and an average withdrawal of 18 mg/d from Section 21, with a maximum daily withdrawal of 22 mg/d from each. After a hearing SWF issued permits authorizing *797 an average withdrawal of 18 mg/d with a maximum daily withdrawal of 22 mg/d from Section 21 well field and an average withdrawal of 19 mg/d with a maximum daily withdrawal of 22 mg/d from Cosme-Odessa well field. The total withdrawal from the Section 21 and Cosme-Odessa fields was not to exceed 168 mg/week, which computes as 24 mg/d from both fields or 12 mg/d from each. The permits authorized withdrawal of an additional 21 mg/week during six weeks of the year to bring the total withdrawal from both fields to 187 mg/week. Regulatory levels below which the city could not pump were also established to monitor the level of the water in the Florida aquifer lying beneath the well fields. Evidence was introduced at the hearing on these applications that the levels set by the permits would allow 12 mg/d to be pumped from each field.

BASIC FLORIDA HYDROLOGY AND GEOLOGY
The basic principles of hydrology are embodied in the concept of the hydrologic cycle. This continuously recurring process is simply described as the circulation of water from the atmosphere to the surface of the earth by precipitation and from the surface to the atmosphere by evaporation. F. Maloney, S. Plager, & F. Baldwin, Water Law and Administration 141 (1968) [hereinafter Water Law]; J. Garcia-Bengochea, R. Pyne, & E. Black, Florida's Water Resources an Evaluation and Management Philosophy 3-1, Project No. 272-75-80, Nov. 1975 (prepared for Pinellas County, Florida) [hereinafter Water Resources]. The water budget is the balance of incoming water to outgoing water. Income to a particular area is derived from rainfall and ground- and surface-water inflow from other areas. Outgo from that area is due to evaporation, plant use, and ground- and surface-water outflow to other areas. The water crop is the amount of rainfall less the amount lost by evaporation and plant use (evapotranspiration).
An aquifer is a water-bearing bed of porous and permeable sediment under the surface of the earth which stores ground water. A nonartesian aquifer occurs in unconfined or water-table conditions which permit the level of ground water to rise and fall according to the water supply. An artesian aquifer occurs when water is confined under pressure beneath a relatively impervious formation. Water Law, supra, at 143; Water Resources, supra, at 4-4. In Florida the elevation of the water-table nonartesian aquifer is generally higher than the elevation of the artesian Florida aquifer, consequently water percolates down to the Florida aquifer from the water-table aquifer. The elevation and degree of porosity, permeability, and transmissivity of the aquifers vary throughout the state even at points located relatively close to one another. R. Cherry, J. Stewart, & J. Mann, General Hydrology of the Middle Gulf Area, Florida 45, 52 (U.S. Geological Survey, Report of Investigation No. 56, 1970).
The water-table aquifer is recharged primarily from rainwater, and the amount it can absorb is principally dependent on its composition. The rainfall, less the amount lost by evapotranspiration, which the water table cannot absorb is runoff to surface-water bodies. The Florida aquifer, which is the main source of water for consumptive use in this state, is largely recharged through inflow from ground-water sources, directly by rainfall, and through infiltration or percolation from the water-table aquifer at a rate dependent on the characteristics of the overlying beds. Water Resources, supra, at 4-4. The balance between the discharge and recharge rate of the Florida aquifer depends on a number of factors, including location of ground-water wells, volume of pumpage, distance of the aquifer from the earth's surface, contours of the surface of the earth, contours of the aquifer, vertical seepage, and ground-water outflow. Water Law, supra, at 145-46. The level of the water in an artesian aquifer at a particular point is measured by the level to which the water rises in a well sunk into that section of the aquifer. Water Law, supra, at 43; Water Resources, supra, at 4-4.

*798 WATER RESOURCES MANAGEMENT IN SOUTHWEST FLORIDA
In 1972 the Florida Water Resources Act was enacted by the state legislature. The dual purpose of the act was to provide for conservation of the available water resources while maximizing the beneficial use of the resources. Section 373.016(1), Florida Statutes. The legislation set out certain goals which the act was designed to effect:
(a) To provide for the management of water and related land resources;
(b) To promote the conservation, development, and proper utilization of surface and ground water;
(c) To develop and regulate dams, impoundments, reservoirs, and other works and to provide water storage for beneficial purposes;
(d) To prevent damage from floods, soil erosion, and excessive drainage;
(e) To preserve natural resources, fish and wild life;
(f) To promote recreational development, protect public lands, and assist in maintaining the navigability of rivers and harbors; and
(g) Otherwise to promote the health, safety, and general welfare of the people of this state.
Section 373.016(2), Florida Statutes. The state was divided into water management districts[1] each headed by a governing board which was authorized, among other things, to "[i]ssue orders to implement or enforce any of the provisions of this chapter or regulations thereunder." Section 373.083(2), Florida Statutes.
Sections 373.203-.249, Florida Statutes, authorized implementation of a consumptive use of water permit system by each water district. Except for domestic consumption of water by individuals, all new and existing uses were subject to the permit procedure. Section 373.219, .226, Florida Statutes. The statute placed the burden on the applicant seeking new use to
establish that the proposed use of water:
(a) Is a reasonable beneficial use as defined in s. 373.019(5); and
(b) Will not interfere with any presently existing legal use of water; and
(c) Is consistent with the public interest.
Section 373.223(1), Florida Statutes. A reasonable beneficial use was defined by the act as
the use of water in such quantity as is necessary for economic and efficient utilization for a purpose and in a manner which is both reasonable and consistent with the public interest.
Section 373.019(5), Florida Statutes. Application for permits for existing uses would be granted if the request was for a reasonable beneficial use and was in accordance with the common law. Section 373.226(2), Florida Statutes. At common law a landowner could withdraw from his property all the ground water he could reasonably use to the extent that it did not injure the adjacent landowner's property. Koch v. Wick, 87 So.2d 47 (Fla. 1956); Annot., 29 A.L.R.2d 1354 (1953). Additionally each district was directed to establish a minimum flow for surface water and minimum water levels for surface and ground water to be set at a point where "further withdrawals would be significantly harmful to the water resources of the area." Section 373.042(2), Florida Statutes.
To effect implementation of a permit system, SWF promulgated certain rules and regulations, the pertinent portions of which were as follows:
Conditions for a Consumptive Use Permit.
(1) The intended consumptive use:
(a) Must be a reasonable, beneficial use.
(b) Must be consistent with the public interest.
(c) Will not interfere with any legal use of water existing at the time of the application.
(2) Issuance of a permit will be denied if the withdrawal of water:

*799 (a) Will cause the rate of flow of a stream or other watercourse to be lowered below the minimum rate of flow established by the Board.
(b) Will cause the level of the potentiometric surface to be lowered below the regulatory level established by the Board.
(c) Will cause the level of the surface of water to be lowered below the minimum level established by the Board.
(d) Will significantly induce salt water encroachment.
(e) Will cause the water table to be lowered so that the lake stages or vegetation will be adversely and significantly affected on lands other than those owned, leased, or otherwise controlled by the applicant.
(3) Issuance of a permit will be denied if the amount of water consumptively used will exceed the water crop of lands owned, leased, or otherwise controlled by the applicant. (Except where determined otherwise, the water crop [precipitation less evapotranspiration] throughout the District will be assumed to be three hundred sixty-five thousand (365,000) gallons per year per acre.)
(4) The withdrawal of water:
(a) From a stream or other watercourse must not reduce the rate of flow by more than five percent (5%) at the time and point of withdrawal.
(b) Must not cause the level of the potentiometric surface under lands not owned, leased, or otherwise controlled by the applicant to be lowered more than five feet (5').
(c) Must not cause the level of the water table under lands not owned, leased, or otherwise controlled by the applicant to be lowered more than three feet (3').
(d) Must not cause the level of the surface of water in any lake or other impoundment to be lowered more than one foot (1') unless the lake or impoundment is wholly owned, leased, or otherwise controlled by the applicant.
(e) Must not cause the potentiometric surface to be lowered below sea level.
(5) The Board for good cause shown may grant exceptions to the provisions of paragraphs (2), (3), and (4) above when after consideration of all data presented, including economic information, it finds that it is consistent with the public interest.
Florida Administrative Code 16J-2.11.

POINTS RAISED BY PETITION FOR WRIT OF CERTIORARI
St. Petersburg has raised several points on this petition for writ of certiorari. The thrust of its arguments, however, is disagreement with SWF's theory of water management.
First, St. Petersburg argues that the legislature intended any limitation on withdrawal to be set by establishing a minimum level of water in the aquifer and that the statutory directives do not allow SWF to restrict withdrawal according to a set number of gallons. We do not agree. There are several references in the act to measurement of the water to be withdrawn by volume in gallons. See, e.g., Section 373.229, Florida Statutes. Water levels are included in the statute as an additional not an exclusive means to effect regulation. Allocation of water resources by a volume measurement is not contrary to the state's policy of maximum use of the resources and is consistent with its policy of conservation of resources. See Section 373.016, Florida Statutes.
Second, St. Petersburg argues that SWF erred by finding that its existing use was only 9 mg/d. St. Petersburg, however, has not shown that it has a reasonable beneficial use beyond the amounts authorized by the permits and as a consequence the extent of its use prior to implementation of the regulatory system need not be considered.
Finally, St. Petersburg contends that rule 16J-2.11(3) was promulgated by SWF in derogation of the stated policy of Chapter 373, that is, maximum use of the water resources. The challenged rule provides that an application will be denied if *800 the requested withdrawal would exceed the water crop of the real property under the control of the applicant. Unlike the common law rule, the water crop theory of water management would restrict withdrawal by reference to the amount of land controlled by the user.[2] For example, if the water crop was 1000 gallons per day per acre and the user owned 10 acres he would be authorized to withdraw 1000 gallons per day from each of 10 acres or a total of 10,000 gallons per day. We are not required to address the propriety of management by the water crop because St. Petersburg has not been damaged by the rule at issue here. Under the challenged rule maximum withdrawal from Section 21 would be.675 mg/d and of Cosme-Odessa would be .632 mg/d based on acreage of those fields of 675 and 632, respectively, and the assumed water crop of 1,000 gallons per day per acre. The permits authorized withdrawal for in excess of what the water crop theory would allow.
By this petition St. Petersburg seeks authorization to withdraw according to regulatory levels "below which significant harm would occur to the resource... ." At the hearing, however, St. Petersburg made it clear that although its main purpose at that time was to avoid a gallonage cap and to be permitted to withdraw according to regulatory levels established by SWF, it intended to challenge the validity of those regulatory levels at a later time since they were allegedly based on the water-crop theory. Petitioner has not demonstrated to this court that the regulatory levels set by the permits were established by reliance on the water crop theory, that is, withdrawal by reference to the number of acres controlled by the applicant. Although an expert witness from SWF testified that the water crop was used in establishing the levels, in our opinion he used the term only to describe the mechanics of establishing those levels. St. Petersburg has failed to demonstrate by any objective evidence that in the part of Hillsborough County where Section 21 and Cosme-Odessa well fields are located that the regulatory levels of the aquifers were established by other than reference to the test of significant harm to the water resources of that area. There was extensive evidence submitted to the governing board of SWF that withdrawal by St. Petersburg beyond that authorized by the permits would cause lowering of surface-water levels of surrounding property as had been occasioned prior to restricted withdrawal from those well fields. During the period of the restricted withdrawals the levels of the surface water had risen as the levels in the aquifers rose, supposedly as a result of decreased withdrawal.
St. Petersburg has also failed to delineate for this court what levels should be set if we agreed with St. Petersburg. In fact, at the hearing St. Petersburg said it did not know what those levels should be. The argument that withdrawal should be permitted until the aquifer would be harmed, such as by salt water intrusion, ignores the overall responsibility with which SWF is charged. SWF not only protects the water resources from extinction, but must also consider the effect of its management policies on the ecology of the area, the other uses of water such as recreation and transportation, and the welfare of the citizenry generally. Section 373.016, Florida Statutes.
St. Petersburg argues that SWF has not complied with the legislative directive to attain the maximum reasonable beneficial use of the available water resources. It has not, however, shown at the hearing before the governing board of SWF or on petition for writ of certiorari to this court that it has a reasonable beneficial use beyond the volume which was granted by SWF. Furthermore, at the hearing evidence was introduced that the quantity authorized was acceptable to St. Petersburg and would meet its current needs. At this point in time St. Petersburg has not shown any injury or hardship resulting from SWF's action *801 on their applications. Accordingly, the ruling of SWF is correct.
The petition for writ of certiorari is
DENIED.
HOBSON and McNULTY, JJ., concur.
NOTES
[1] SWF was actually created by the legislature in 1961. The purpose of the agency at that time, however, was limited to flood control, authorized by Chapter 378, Florida Statutes.
[2] It is not clear from the face of the rule whether SWF meant acreage of the proposed well field or the total acreage controlled by the applicant. Both parties and references to the water crop in the scientific data included in the record refer to acreage of a well field.