371 So.2d 663 (1979)
The VILLAGE OF TEQUESTA, Etc., et al., Petitioners,
v.
JUPITER INLET CORPORATION, Etc., Respondent.
No. 52223.
Supreme Court of Florida.
May 3, 1979.
Rehearing Denied June 26, 1979.
John C. Randolph of Johnston, Sasser & Randolph, West Palm Beach, for petitioners.
Marjorie D. Gadarian of Jones, Paine & Foster, West Palm Beach, for respondent.
Robert Grafton, Thomas J. Schwartz, John H. Wheeler and Stephen A. Walker, West Palm Beach, amicus curiae for South Florida Water Management District.
John T. Allen, Jr., St. Petersburg, amicus curiae for Pinellas County.
Louis de la Parte, Jr., Tampa, amicus curiae for West Coast Regional Water Supply Authority.
Jacob D. Varn, of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, amicus curiae for Pasco County, S.C. Bexley, Jr., L.S.B. Corporation, and Angeline Corporation.
*665 John F. Wendel, of Wendel, Broderick & Chritton, Lakeland, amicus curiae, for Citrus County.
ADKINS, Justice.
Pursuant to article V, section 3(b)(3), Florida Constitution, the Fourth District Court of Appeal in Jupiter Inlet Corp. v. Village of Tequesta, 349 So.2d 216 (Fla. 4th DCA 1977) certified to this Court as a matter of great public interest the following question:
Can a municipality be held responsible through inverse condemnation for a taking, from private ownership for public purposes, of underground shallow aquifer water, to the extent that the owner is deprived of the beneficial use of the aquifer?
Jupiter Inlet Corporation, plaintiff in the trial court, will be referred to as Jupiter, and The Village of Tequesta, defendant in the trial court, will be referred to as Tequesta.
Jupiter owned property near Tequesta on which it planned to build a 120-unit condominium project, "Broadview." This property was located approximately 1200 feet from Tequesta's well field number four. This well field contained seven wells, seventy-five to ninety feet deep, which pumped in excess of a million gallons of water a day from the shallow water aquifer to supply Tequesta residents with water. It was relatively inexpensive to withdraw water from the shallow-water aquifer.
As a result of the excessive amount of water withdrawn by Tequesta from the shallow-water aquifer, the fresh-water supply was endangered and salt water from the intercoastal waterway intruded into the shallow-water aquifer. There was testimony from a hydrologist that saltwater intrusion was caused by a reduction in the water levels in the interior to a point low enough that the fresh-water level could not withstand the pressure of the saltwater level in the intercoastal. The water which Tequesta withdrew came from the shallow-water aquifer beneath its property. Because Tequesta would not supply Jupiter water, it was necessary for Jupiter to secure a special exception from the county. Tequesta opposed the permit application and it was denied. Jupiter was not permitted to drill wells to withdraw water from the shallow-water aquifer because of the endangered condition of the aquifer due to the excessive withdrawals made by Tequesta.
The only means by which Jupiter could supply water to its property was to drill a well to the Floridan aquifer located 1200 feet below the surface, at a substantially greater cost.
Jupiter instituted an action for inverse condemnation and injunction due to the excessive pumping by Tequesta. The theory of Jupiter's action was that due to depletion by Tequesta of the shallow-water aquifer beneath its property Jupiter was effectively deprived of the beneficial use of its property rights in the shallow-water aquifer.
Considering any factual conflicts in the light most favorable to Jupiter, the trial judge granted a summary judgment in favor of the Village of Tequesta. Viewing the facts in the same light as did the trial court, the district court of appeal said:
The owner has been deprived by government action of the use and enjoyment of what was his, and so through a suit in inverse condemnation he can compel the government to pay for what it has taken.
349 So.2d at 217. The district court of appeal then certified the above question to this Court for consideration.
The following hydrological statements are fully supported by F. Maloney, S. Plager, and F. Baldwin, Water Law and Administration, page 141 (1968) (hereinafter referred to as Water Law) as well as the discussion in City of St. Petersburg v. Southwest Florida Water Management District, 355 So.2d 796 (Fla. 2d DCA 1977).
Water-bearing zones under the earth's surface capable of receiving, storing, and transmitting water are called aquifers. Most aquifers in Florida are cavernous limestone or sand and shale beds. Aquifers are separated by relatively impervious layers of shales and clays which are called aquicludes.
*666 There are two basic types of acquifers. One is the unconfined aquifer associated with the water table. It is free to rise and fall with the amount of rainfall and other surface-water influences such as rivers, lakes, irrigation, etc. Near the coast the water level in this aquifer fluctuates with the tidal action. It is referred to as the ground-water aquifer, water-table aquifer, and the shallow aquifer.
The other type of aquifer is an artesian aquifer. Water in this aquifer is confined within aquicludes. Water will either not pass through these aquicludes or will do so at a much slower rate than it can travel within the aquifer itself. Water enters artesian aquifers slowly through the surrounding aquiclude by virtue of fissures, sinkholes, or other openings in the aquiclude. Water in the artesian aquifer is under pressure. One artesian aquifer is known as the Floridan aquifer. It underlies most of the state and furnishes most of the well-water supplies of the state.
In an early decision, Tampa Watchworks Co. v. Cline, 37 Fla. 586, 20 So. 780 (1896), we made a classification of water passing over or through lands as follows:
(1) In respect to surface streams which flow in a permanent, distinct, and well-defined channel from the lands of one owner to those of another; (2) in respect to surface waters, however originating, which, without any distinct or well-defined channel, by attraction, gravitation, or otherwise, are shed and pass from the lands of one proprietor to those of another; (3) subterranean streams which flow in a permanent, distinct, and well-defined channel from the lands of one to those of another proprietor; (4) subsurface waters which, without any permanent, distinct, or definite channel, percolate in veins or filter from the lands of one owner to those of another.
20 So. at 782.
Although we classified water as if its different physical states were separate and distinct, we recognize that these classes are interrelated parts of the hydrologic cycle. We are primarily concerned in this case with the rights of landowners in the shallow-water aquifer.
Ancient law gave no special consideration to ground water, treating all water like the air, the sea, and wild animals, as the property of no one or the property of everyone. Trelease, Government Ownership and Trusteeship of Water, 45 Calif. Law Review 638, 640 (1957). Technological ignorance about the existence, origin, movement and course of percolating ground waters resulted in the so-called "English rule" which essentially allowed a land owner to take or interfere with percolating waters underlying his land, irrespective of any effects his use might have on ground water underlying his neighbors' lands. This doctrine, first enunciated in 1843 in an English case, Acton v. Blundell, 152 Eng.Rep. 1235 (1843) was based upon the maxim, "To whomsoever the soil belongs, he owns also to the sky and to the depths." See Water Law at 155. With the growth of hydrological capabilities in pumping technology, the English rule was repudiated in most American jurisdictions. See Annots. 29 A.L.R.2d 1354, 1361-65 (1953); 109 A.L.R. 395, 399-403 (1937); 55 A.L.R. 1385, 1398-1408 (1928), and cases cited therein. The so-called "American," or "reasonable use," rule rejected the "to the sky and to the depths" notion for another maxim, "use your own property so as not to injure that of another." See Koch v. Wick, 87 So.2d 47 (Fla. 1956); Cason v. Florida Power Co., 74 Fla. 1, 76 So. 535 (Fla. 1917); Bassett v. Salisbury Manufacturing Co., 43 N.H. 569 (1862). The reasonable use rule adopted by most Eastern states, including Florida, was stated by one court as follows:
[A] landowner, who, in the course of using his own land, obstructs, diverts, or removes percolating water to the injury of his neighbor ... must be [making] a reasonable exercise of his proprietary right, i.e., such an exercise as may be reasonably necessary for some useful or beneficial purpose, generally relating to the land in which the waters are found.
*667 Finley et ux. v. Teeter Stone, Inc., 251 Md. 428, 435, 248 A.2d 106, 111-12 (Md. App. 1968). See also Water Law at 158.
In applying the reasonable use rule this Court has not given definite answers as to the actual amount of water that may be taken by overlying land owners, nor have we considered the meaning of the term "ownership" as applied to percolating water.
In 93 C.J.S. Waters section 90, page 765 (1956), the rule is stated thus:
There can be no ownership in seeping and percolating waters in the absolute sense, because of their wandering and migratory character, unless and until they are reduced to the actual possession and control of the person claiming them. Their ownership consists in the right of the owner of the land to capture, control, and possess them, to prevent their escape, if he can do so, from his land, and to prevent strangers from trespassing on his land in an effort to capture, control, or possess them. If percolating waters escape naturally to other lands, the title of the former owner is gone; while a landowner may prevent the escape of such waters from his land, if he can do so, yet he has no right to follow them into the lands of another and there capture, control, or reduce them to possession. [Footnotes omitted].
The common-law concept of absolute ownership of percolating water while it is in one's land gave him the right to abstract from his land all the water he could find there. On the other hand, it afforded him no protection against the acts of his neighbors who, by pumping on their own land, managed to draw out of his land all the water it contained. Thus the term "ownership" as applied to percolating water never meant that the overlying owner had a property or proprietary interest in the corpus of the water itself.
This necessarily follows from the physical characteristic of percolating water. It is migratory in nature and is a part of the land only so long as it is in it. There is a right of use as it passes, but there is no ownership in the absolute sense. It belongs to the overlying owner in a limited sense, that is, he has the unqualified right to capture and control it in a reasonable way with an immunity from liability to his neighbors for doing so. When it is reduced to his possession and control, it ceases to be percolating water and becomes his personal property. But if it flows or percolates from his land, he loses all right and interest in it the instant it passes beyond the boundaries of his property, and when it enters the land of his neighbor it belongs to him in the same limited way.
The right of the owner to ground water underlying his land is to the usufruct of the water and not to the water itself. The ownership of the land does not carry with it any ownership of vested rights to underlying ground water not actually diverted and applied to beneficial use.
In Valls v. Arnold Industries, Inc. et al., 328 So.2d 471, 473 (Fla. 2d DCA 1976) the court said:
Water, oil, minerals and other substances of value which lie beneath the surface are valuable property rights which cannot be divested without due process of law and the payment of just compensation.
This case involved a post-trial apportionment award in condemnation as between fee-title owners and owners of reserved mineral rights. In order to effect a payment to the holders of the mineral rights, it was necessary for the court to find that these mineral rights were property rights and therefore subject to condemnation. The court relied upon Copello v. Hart, 293 So.2d 734 (Fla. 1st DCA 1974) and Dickinson et al. v. Davis et al., 224 So.2d 262 (Fla. 1969). These cases held that minerals, gas, and oil are separate properties from the surface and may be conveyed and taxed separately. Neither case referred to property rights in water.
We overrule the dicta in Valls, supra, that water beneath the surface is a private property right which cannot be divested under any circumstances without due process of law and the payment of just *668 compensation. The right to use water does not carry with it ownership of the water lying under the land. Of course, "property" in its strict legal sense "means that dominion or indefinite right of user and disposition which one may lawfully exercise over particular things or objects." Tatum Brothers, etc. v. Watson, 92 Fla. 278, 109 So. 623, 626 (1926). This "right of user" may be protected by injunction, Koch v. Wick, supra, or regulated by law, Pounds v. Darling, 75 Fla. 125, 77 So. 666 (1918); Broward v. Mabry, 58 Fla. 398, 50 So. 826 (1909), but the right of user is not considered "private property" requiring condemnation proceedings unless the property has been rendered useless for certain purposes. For example, in Kendry et al. v. State Road Department, 213 So.2d 23 (Fla. 4th DCA 1968), the state agency caused such flooding on the owner's property that it was rendered useless for residential purposes. This was a "taking."
In the case sub judice, Jupiter was only subjected to the consequential damages incurred when it was required to draw water from the Floridan aquifer instead of the shallow-water aquifer. It still had a "right of user."
There is a distinction when this right of user as to water has been invaded by circumstances showing an intentional invasion in an unreasonable manner or an unintentional invasion when the conduct was negligent, reckless, or ultrahazardous, resulting in a destruction of the right of user as to land.
For example, in Labruzzo et ux. v. Atlantic Dredging & Const. Co. etc., 54 So.2d 673 (Fla. 1951), plaintiff sued for damages for the interruption and diversion of the natural flow of the underground waters which fed plaintiff's spring. The defendant contended that there was no indication of the existence of a well-defined subterranean stream feeding plaintiff's spring. Therefore, the source of the spring should have been considered percolating waters, the flow of which had been interrupted by the defendant in the lawful and reasonable use of its property. Under the reasonable use rule, defendant contended that plaintiff had no cause of action. The trial judge agreed and, upon appeal, this Court reversed, saying:
At the outset, it should be noted that we are not here dealing with a problem involving a proprietary competition over the water itself  that is to say, there is no conflict here between the respective rights of persons to make competing proprietary uses of subterranean waters to which they both have access. In such cases, the present trend among the courts of this country is away from the old common-law rule of unqualified and absolute right of a landowner to intercept and draw from his land the percolating waters therein; and the latter cases hold that the right of a landowner to subterranean waters percolating through his own land and his neighbor's lands is limited to a reasonable and beneficial use of such waters... .
In the instant case, however, we are concerned with an interference with plaintiffs' use of the spring on their land, caused by conduct of the defendant not involving a competing use of water and in which the effect on the subterranean water is only incidental to the defendant's use of its land. Obviously, then, the rule of "reasonable use," as engrafted upon the old common-law rule of absolute and unqualified ownership of percolating waters, insofar as the proprietary beneficial use of the water is concerned, has no application here where we are concerned with the proprietary use of land, and in which the water is only incidentally affected. Under such circumstances, even at common law, a person was subject to liability for interference with another's use of water, either for (1) an intentional invasion when his conduct was unreasonable under the circumstances of the particular case, or (2) an unintentional invasion when his conduct was negligent, reckless or ultrahazardous. Restatement of Torts, Vol. IV, Section 849, and Sections 822-840. In the absence, then, of surface indications, an interference with subterranean water is, or course, unintentional and damnum absque injuria unless *669 the conduct resulting therein is negligent, reckless or ultrahazardous... .
Since the allegations of plaintiffs' declaration must be taken as true on demurrer, it is clear that plaintiffs have stated a cause of action for an intentional invasion by defendant of their water rights, for which it must respond in damages if its conduct was unreasonable under the particular circumstances... . [Citations omitted].
54 So.2d at 675-77.
Article X, section 6, of the Florida Constitution forbids the "taking" of private property except for a public purpose and with full compensation. Unlike the constitutions of several other states, the Florida Constitution does not expressly forbid "damage" to property without just compensation. Arundel Corp. et al. v. Griffin et al., 89 Fla. 128, 103 So. 422 (1925).
When the governmental action is such that it does not encroach on private property but merely impairs its use by the owner, the action does not constitute a "taking" but is merely consequential damage and the owner is not entitled to compensation. Selden et al. v. City of Jacksonville, 28 Fla. 558, 10 So. 457 (1891).
In Poe v. State Road Department, 127 So.2d 898, 901 (Fla. 1st DCA 1961) the court said:
It is universally recognized that injury by the condemnor to remaining land caused by obstructing, diverting or increasing the flow of surface waters, but which do not amount to a permanent deprivation by the owner of the use of such remaining lands, is a consequential damage resulting from the taking in an eminent domain proceeding, and must be recovered in that proceeding, if at all. [Footnote omitted].
If the damage suffered by the owner is the equivalent "of a taking" or an appropriation of his property for public use, then our constitution recognizes the owner's right to compel compensation. On the other hand, if the damage suffered is not a taking or an appropriation within the limits of our organic law, then the damages suffered are damnum absque injuria and compensation therefor by the public agency cannot be compelled. Weir v. Palm Beach County, 85 So.2d 865 (Fla. 1956).
The district court of appeal, in its opinion, relied upon White v. Pinellas County, 185 So.2d 468 (Fla. 1966), as authority for the principle that a taking can occur when any property rights are involved. This case involved trees and shrubs located on the property which were used as a windbreak and a privacy screen. In White there was a physical invasion of the property when the state, through its agents, cut down large trees and shrubs. In the case sub judice there was no physical invasion of Jupiter's property by the agents of Tequesta, so no compensation is due for consequential damage.
The cases relied upon by respondent involve situations where there was damage to the land itself, a result which does not exist in this case. Cason v. Florida Power Co., supra, dealt with resulting damage to the fee because of the diversion of percolating water. Koch v. Wick, supra, dealt with damage to the fee by diversion of water therefrom to the point that the fee would become infertile and unsuitable for cultivation. In State Road Department et al. v. Tharp, 146 Fla. 745, 1 So.2d 868 (1941), the construction of a highway embankment impeded the flow and raised the level of a millrace to such an extent as to destroy the use of plaintiff's grist mill. This was held to be a taking.
The "reasonable use" rule insofar as the proprietary beneficial use of water is concerned has no application where the court is concerned with the proprietary use of land, and in which the water is only incidentally affected. See Labruzzo v. Atlantic Dredging and Construction Co., supra.
Property owners have been successful in seeking relief under the theory of inverse condemnation against the appropriate authority as a result of the excessive noise from low-flying jet aircraft. See Hillsborough County Aviation Authority v. Benitez, 200 So.2d 194 (Fla. 2d DCA 1967). The *670 "taking" of an airspace above the land is not comparable to the "taking" of the water located in a ground aquifer beneath the land in the absence of a trespass on the land itself. The damage to the airspace was such as to deprive the property owners of all beneficial use of their property. The alleged damage to the shallow-water aquifer deprived Jupiter of no beneficial use of the land itself. Jupiter developed the property to its highest and best use and has suffered no more than consequential damage, which is not compensable through inverse condemnation.
The bare essential facts controlling this case are simple and direct. Tequesta utilized all of the available percolating water of the shallow-well aquifer in the area of Jupiter's land. Jupiter decided to become a competing user. This desire was thwarted because Tequesta had utilized all of the water which could be safely withdrawn from the shallow-well aquifer. This meant Jupiter had to go deeper to the Floridan aquifer to obtain its water and to spend more money than it would have if allowed to use the shallow-well aquifer. The costs were increased both in drilling and treatment of the water. It is a hydrologic impossibility to place a value upon the water which was withdrawn from underneath Jupiter's land.
It is incumbent upon Jupiter to show, not only a taking, but also that a private property right has been destroyed by governmental action. Jupiter did not have a constitutionally protected right in the water beneath its property. In the cases cited by Jupiter, the courts supported compensation for the taking of a use which was existent and of which a party was deprived. Jupiter seeks to be compensated for a use which it had never perfected to the point that it was in existence. Jupiter had a right to use the water, but the use itself is not existent until this right is exercised.
The property rights relative to waters that naturally percolate through the land of one owner to and through the land of another are correlative. Reasonableness could only be determined after the conflict arises between users. The "reasonableness" of a given use depends upon many variables such as: the reasonable demands of other users; the quantity of water available for use; the consideration of public policy. Even an allocation between conflicting users has no durability, for the decision by another land owner to exercise his previously neglected right to use water could easily render all other uses unreasonable. A person developing his own land could make a substantial investment with no way of determining whether reasonable use by others would limit or destroy his development right even though it was the first in time.
The judicial system was ill-equipped to deal with such conflict and became oriented to a case-by-case approach to solving disputes. This Court recognizes that all conflicts between competing users must be determined from the facts and circumstance of particular cases as they arise. Cason v. Florida Power Co., supra. This "right to use" is not "private property" as contemplated by article X, section 6, Florida Constitution requiring full compensation before taking for a public purpose.
The State of Florida operates under an administrative system of water management pursuant to the terms of the Florida Water Resources Act. Ch. 373, Fla. Stat. (1972). The law prior to the Florida Water Resources Act did not allow ownership in the corpus of the water, but only in the use of it. Even then, the use was bounded by the perimeters of reasonable and beneficial use. Legislation limiting the right to the use of the water is in itself no more objectionable than legislation forbidding the use of property for certain purposes by zoning regulations. Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); 54 A.L.R. 1016 (1928).
The Florida Water Resources Act, in recognizing the need for conservation and control of the waters in the state (Section 373.016, Fla. Stat. (1973)) makes all waters in the state subject to regulation, unless otherwise specifically exempt. § 373.023(1) Fla. Stat. (1973). The Department *671 of Environmental Regulation and the various water management districts are given the responsibility to accomplish the conservation, protection, management, and control of the waters of the state. § 373.016(3) Fla. Stat. (1973). In order to exercise such controls a permitting system is established which requires permits for consumptive use of water, exempting only "domestic consumption of water by individual users" from the requirements of a permit. § 373.219(1) Fla. Stat. (1973). Jupiter, in serving a 120-unit condominium, does not qualify as an individual user and thus must secure a permit in order to draw water from beneath its property. Without a permit Jupiter has no such property right to the use of water beneath its land for which, upon deprivation, it must be compensated through inverse condemnation.
The Water Resources Act of 1972 recognizes a right to use water under the common law as separate from the right to use water under a permit granted pursuant to the act. This is done by a provision concerning the termination of the common-law right and a transitional procedure. The holder of such a common-law water-use right was given two years to convert the common-law water right into a permit water right. § 373.226(3) Fla. Stat. (1973). In order to qualify for the initial permit under section 373.226(2) Florida Statutes (1973), the right must have been exercised prior to the implementation of the Florida Water Resources Act by a water management district with geographical jurisdiction in that area. Otherwise the right is abandoned and extinguished requiring a new application for a permit. Tequesta had acquired the permit and Jupiter was merely a proposed user. The Florida Water Resources Act makes no provision for the continuation of an unexercised common-law right to use water. Jupiter had perfected no legal interest to the use of the water beneath its land which would support an action in inverse condemnation.
Section 373.1961 Florida Statutes (1975) provides additional powers and duties for the governing boards of the water management district. Subsection (7) provides that the governing board:
May acquire title to such interest as is necessary in real property, by purchase, gift, devise, lease, eminent domain, or otherwise, for water production and transmission consistent with this section. However, the district shall not use any of the eminent domain powers herein granted to acquire water and water rights already devoted to reasonable and beneficial use or any water production or transmission facilities owned by any county, municipality, or regional water supply authority. [Emphasis supplied].
Condemnation of "water rights" is not granted in the first sentence of this subsection. The authority granted is specifically limited to the acquisition of land for the purpose of constructing and operating well fields and other withdrawal facilities and for the right-of-way necessary for the transmission of water to consumers. The second sentence prohibits he use of eminent domain to acquire such "water rights" which were already being put to a reasonable and beneficial use. The statutory prohibition of the use of eminent domain in one situation cannot be used as authority for its use by implication in another, as the statute must be strictly construed. Canal Authority v. Miller, 243 So.2d 193 (Fla. 1970). All that Section 373.1961(7) Florida Statutes (1975) accomplishes is to further protect presently existing legal uses of water. No implication can be drawn that this section intends to include any "water right" other than the permit that may be granted by a water management district. After all, if a use of water is both preexisting and also reasonable and beneficial, after two years, it must be either under permit or it is conclusively presumed to be abandoned. There was no necessity for the Water Resources Act to provide for the condemnation of an unexercised right to use water, as the owner became subject to the permit provisions of the law. There was no "taking" of this right.
*672 In summary, we hold:
1. Prior to the adoption of the Water Resources Act, Florida followed the reasonable use rule; that is, a landowner, who, in the course of using his own land, removes percolating water to the injury of his neighbor, must be making a reasonable exercise of his proprietary rights, i.e., such an exercise as may be reasonably necessary for some useful or beneficial purpose, generally relating to the land in which the waters are found;
2. There was no ownership in the waters below the land, as the right of the owner to ground water underlying his land was to the use of the water and not to the water itself;
3. In applying the reasonable use rule, this Court has not given definite answers as to the actual amount of water that may be taken by overlying landowners;
4. The diversion of water from the shallow-water aquifer is not a "taking" or an appropriation of property for public use requiring condemnation proceeding unless there is a resulting damage to the land itself, for example, a diversion of water to the extent that the land becomes unsuitable for cultivation, raising the level of flowing waters to the extent that land is flooded, etc.;
5. The landowner does not have a constitutionally-protected property right in the water beneath the property, requiring compensation for the taking of the water when used for a public purpose;
6. Just as legislation may limit the use of property for certain purposes by zoning, so it is that the right to the use of the water may also be limited or regulated.
7. The Water Resources Act now controls the use of water and replaces the ad hoc judicial determination in water management districts where consumptive use permitting is in force.
8. Jupiter's remedy is only through proper application for a permit under the Florida Water Resources Act.
For the above reasons, we answer the certified question in the negative and hold that Tequesta cannot be held responsible for damages through inverse condemnation.
The decision of the district court of appeal is quashed and this cause is remanded with instructions to affirm the summary judgment entered by the trial judge in favor of Tequesta.
ENGLAND, C.J., and BOYD, OVERTON AND SUNDBERG, JJ., concur.