774 So.2d 903 (2001)
SOUTHWEST FLORIDA WATER MANAGEMENT DISTRICT; Environmental Confederation of Southwest Florida; and Manatee County, Appellants/Cross-Appellees,
v.
CHARLOTTE COUNTY, Appellee, and
Pinellas County; Desoto County and Hardee County; Polk County; and Florida Citrus Mutual, Appellees/Cross-Appellants.
Nos. 2D97-1626, 2D97-2204 and 2D97-2206.
District Court of Appeal of Florida, Second District.
January 5, 2001.
*905 Virginia B. Townes of Akerman, Senterfitt & Eidson, P.A., Orlando, and William S. Bilenky, Brooksville, for Appellant/Cross-Appellee Southwest Florida Water Management District.
S. Ansley Samson and David G. Guest of Earthjustice Legal Defense Fund, Inc., Tallahassee, for Appellant/Cross-Appellee Environmental Confederation of Southwest Florida.
Teddy N. Williams, Jr., County Attorney, and Jeffrey N. Steinsnyder, Senior Assistant County Attorney, Bradenton, for Appellant/Cross-Appellee Manatee County.
Christopher H. Bentley and Diane Tremor of Rose, Sundstrom & Bentley, Tallahassee, for Appellee Charlotte County.
Edward P. de la Parte, Jr., David M. Caldevilla, and Charles R. Fletcher of de la Parte, Gilbert & Bales, P.A., Tampa, for Appellee/Cross-Appellant Pinellas County.
*906 Kent A. Zaiser, Tallahassee; Daniel P. Fernandez, Tampa; Laura A. Olson, Tampa; and Gary A. Vorbeck, Arcadia, for Appellees/Cross-Appellants DeSoto County and Hardee County.
Mark F. Carpanini, Karla Foreman Wright, Palmer C. Davis, and Barbara Coleman, Bartow, for Appellee/Cross-Appellant Polk County.
Michael A. Skelton of Michael A. Skelton, P.A., Tampa, for Appellee/Cross-Appellant Florida Citrus Mutual.
Kathryn L. Mennella, Jennifer B. Springfield, and Stanley J. Niego, Palatka, for St. Johns River Water Management District, Amicus Curiae.
Robert G. Gough, Assistant General Counsel, Department of Environmental Protection, Tallahassee, for Department of Environmental Protection, Amicus Curiae.
DANAHY, PAUL W., (Senior) Judge.
Pursuant to section 120.68, Florida Statutes (Supp.1996), the Southwest Florida Water Management District (the District), Manatee County, and the Environmental Confederation of Southwest Florida appeal portions of the comprehensive 652-page order of the Administrative Law Judge (ALJ) that invalidated several of the District's existing or proposed rules and agency statements.[1] Several parties, including Pinellas County (Pinellas), DeSoto and Hardee Counties, and Florida Citrus Mutual, filed notices of cross-appeal challenging portions of the order which upheld the validity of certain proposed and existing rules and agency statements. The primary parties to the appeal are the District and Pinellas. There are eleven issues on appeal. Three of these issues have become moot because the District withdrew the rules in question, and we decline to rule on these particular issues. We reverse the ALJ's ruling on the four remaining issues in the appeal and affirm the ALJ's rulings on the issues raised in the cross-appeal.
Pinellas and various other parties filed numerous petitions for administrative proceedings pursuant to sections 120.535, 120.54, and 120.56, Florida Statutes (1995), challenging proposed and existing rules and agency statements of the District governing the issuance of Water Use Permits (WUPs). The primary basis of the challenges was that the particular rule or agency statement was an invalid exercise of delegated legislative authority as defined by section 120.52(8), Florida Statutes (1995).[2] The proposed rules and agency statements were intended to govern the issuance of WUPs in the Southern Water Use Caution Area (SWUCA),[3] a portion of the territory under the jurisdiction of the District encompassing all of DeSoto, Hardee, Manatee, and Sarasota Counties, and portions of Charlotte, Highlands, Hillsborough, and Polk Counties. The existing rules under challenge govern the issuance of WUPs throughout the entire area encompassed in the District's jurisdiction, which includes all or part of sixteen counties. The District's water use permitting *907 rules are published in chapter 40D-2 of the Florida Administrative Code (FAC). The proposed SWUCA rules were published in the Florida Administrative Weekly. The agency statements under challenge in this case are contained in a separate document entitled "Basis of Review for Water Use Permit Applications" (BOR), which is incorporated by reference in rule 40D-2.091 and in proposed rule 40D-2.091. The BOR defines important terms, explains permitting policies and procedures, and outlines performance standards for several of the water use permitting conditions adopted by the District.
The ALJ consolidated the challenges of the various parties to the proposed and existing rules and agency statements and held a formal evidentiary hearing pursuant to section 120.57, Florida Statutes (1995). Although the hearing took place during a three-month period in 1995, the ALJ did not enter his order until March 1997. The order invalidated numerous existing and proposed rules and agency statements and also upheld numerous existing and proposed rules and agency statements.
Prior to the Florida Water Resources Act of 1972,[4] which is codified in chapter 373, Florida Statutes, water rights were governed under Florida common law by the reasonable use rule. See Village of Tequesta v. Jupiter Inlet Corp., 371 So.2d 663 (Fla.1979). The Florida Water Resources Act brought Florida from a common law system to a statutory permitting system and was patterned, in large part, upon A Model Water Code,[5] a legislative proposal drafted by law professors at the University of Florida. See Erik Swenson, Public Trust Doctrine and Groundwater Rights, 53 U. Miami L.Rev. 363 (Jan.1999).
Section 373.016(3), Florida Statutes (1995),[6] vests power and responsibility in the Department of Environmental Protection (DEP)[7] "to accomplish the conservation, protection, management, and control of the waters of the state and with sufficient flexibility and discretion to accomplish these ends through delegation of appropriate powers to the various water management districts." The statute encouraged DEP to delegate power to the districts "to the greatest extent practicable." In 1989, DEP was directed by the legislature to "[a]dopt by rule a state water policy, which shall provide goals, objectives, and guidance for the development and review of programs, rules, and plans relating to water resources." § 373.026(10), Fla.Stat. (1989). The resulting Water Policy[8] is published at chapter 62-40 of the FAC. That the Water Policy Rules are intended as a guide to the water management districts in their promulgation of water permitting rules is further established in rule 62-40.110, the "Declaration and Intent" section of the Water Policy Rules. Prior to June 2000, section (2) of this rule stated: "This Chapter is intended to provide water policy goals,[9] objectives, and guidance for the development and review of programs, rules, and plans relating to water resources, as expressed in Chapters 187, 373, and 403, Florida Statutes." Section (9) states: "This Chapter does not repeal, amend or otherwise alter any rule now existing or later adopted by the Department or [water management] Districts. However, procedures are included in this Chapter which provide for the review *908 of Department and District plans, programs, and rules to assure consistency with the provisions of this Chapter."
Section 373.223(1), Florida Statutes (1995), states that to obtain a WUP, the applicant must establish that the proposed use of water: (a) is reasonable-beneficial; (b) will not interfere with any presently existing legal water use; and (c) is consistent with the public interest. Section 373.113, Florida Statutes (1995), states that in administering the provisions of chapter 373 a governing board of a water management district "shall adopt, promulgate, and enforce such regulations as may be reasonably necessary to effectuate its powers, duties, and functions pursuant to the provisions of chapter 120."[10]See also § 373.044, Fla.Stat. (1995). Section 373.219(1), Florida Statutes (1995), gives the water management districts the power to require permits for the consumptive use of water and to impose such reasonable conditions as are necessary to ensure "that such use is consistent with the overall objectives of the district or department." Thus, the District may adopt reasonable rules in connection with its water use permitting duties in implementing the three-prong test under section 373.223(1). DEP maintains general supervisory authority over the water management districts. See § 373.026(7), Fla.Stat. (1995). DEP also has the exclusive authority to review the rules of the districts to ensure consistency with the Water Policy Rules. See § 373.114(2), Fla.Stat. (1995).
As we have said, chapter 120 was amended effective October 1, 1996, subsequent to the evidentiary hearing but prior to the entry of the order in this case. Prior to the amendment, the burden of persuasion fell on a challenger to establish the invalidity of both an existing rule and a proposed rule. See St. Johns River Water Management Dist. v. Consolidated-Tomoka Land Co., 717 So.2d 72 (Fla. 1st DCA 1998), cited with approval in Department of Bus. & Prof'l Regulation v. Investment Corp., 747 So.2d 374 (Fla.1999). However, as noted in Consolidated-Tomoka, section 120.56(2)(a), Florida Statutes (Supp.1996), was amended to place the burden on the agency to prove that a proposed rule is not an invalid delegation of legislative authority once the challenger has stated "with particularity the objections to the proposed rule and the reasons that the proposed rule is an invalid exercise of delegated legislative authority." § 120.56(2)(a). The court in Consolidated-Tomoka concluded that "[n]othing in section 120.56(2) requires the agency to carry the burden of presenting evidence to disprove an objection alleged in a petition challenging a proposed rule." 717 So.2d at 76. Instead, "[a] party challenging a proposed rule has the burden of establishing a factual basis for the objections to the rule, and then the agency has the ultimate burden of persuasion to show that the proposed rule is a valid exercise of delegated legislative authority." 717 So.2d at 77. The court noted that the burden of persuasion in a challenge to an agency statement under section 120.56(4), Florida Statutes (Supp. 1996),[11] remains on the challenger. The basis for a challenge to an agency statement under this section is that the agency statement constitutes a rule as defined by section 120.52(15), Florida Statutes (Supp. 1996),[12] but that it has not been adopted by the rule-making procedure mandated by section 120.54.
In the present case, the challenges to the existing and proposed agency statements *909 on the grounds that they represent an invalid delegation of legislative authority are distinct from a section 120.56(4) challenge that the agency statements are functioning as unpromulgated rules. It is, instead, a challenge to their validity as rules after their incorporation by reference in existing and proposed rule 40D-2.091.[13]See, e.g., Lanoue v. Department of Law Enforcement, 751 So.2d 94 (Fla. 1st DCA 1999) (holding defendant has standing to challenge two administrative rules and Form 16, adopted by reference in rule 11D-8.003(7), as invalid exercises of delegated legislative authority).
"The general rule [of statutory construction] is that a substantive statute will not operate retrospectively absent clear legislative intent to the contrary, but that a procedural or remedial statute is to operate retrospectively." State Farm Mut. Auto. Ins. Co. v. Laforet, 658 So.2d 55, 61 (Fla.1995). A statute that determines who carries the burden of persuasion is a procedural statute. This could be problematic in a case such as the one before us, where the hearing took place prior to the amendment shifting the burden of persuasion in a challenge to a proposed rule to the agency, but the order was entered after the effective date of the amendment. However, in the present case, we determine that our ruling would be the same regardless of whether the agency or the challenger shouldered the burden of persuasion in connection with the proposed rules.
In implementing the three-prong test outlined in section 373.223(1), the District promulgated rule 40D-2.301(1) of the FAC that contains fourteen criteria that a WUP applicant must meet:
(1) In order to obtain a Water Use Permit, an Applicant must demonstrate that the water use is reasonable and beneficial, is in the public interest, and will not interfere with any existing legal use of water, by providing reasonable assurances, on both an individual and a cumulative basis, that the water use:
(a) Is necessary to fulfill a certain reasonable demand;
(b) Will not cause quantity or quality changes which adversely impact the water resources, including both surface and ground waters;
(c) Will not cause adverse environmental impacts to wetlands, lakes, streams, estuaries, fish and wildlife or other natural resources;
(d) Will not cause water levels or rates of flow to deviate from the ranges set forth in Chapter 40D 8;
(e) Will utilize the lowest water quality the Applicant has the ability to use;
(f) Will not significantly induce saline water intrusion;
(g) Will not cause pollution of the aquifer;
(h) Will not adversely impact offsite land uses existing at the time of the application;
(i) Will not adversely impact an existing legal withdrawal;
(j) Will utilize local water resources to the greatest extent practicable;
(k) Will incorporate water conservation measures;
(l) Will incorporate reuse measures to the greatest extent practicable;
(m) Will not cause water to go to waste; and
(n) Will not otherwise be harmful to the water resources within the District.
The ALJ found in the "Ordered and Concluded" section of the order that that portion of the rule "which requires an applicant to satisfy each subsection of the rule in order to obtain a water use permit" is an invalid exercise of delegated legislative authority. The ALJ based his reasoning on his interpretation of previous rule *910 62-40.401(2)[14] of the Water Policy Rules which states: "In determining whether a water use is a reasonable-beneficial use, the following [eighteen] factors will be considered[.]" The ALJ found that "the State Water Policy [the Water Policy Rules] implicitly anticipates a balancing approach where the various factors delineated will be weighed together and the failure to satisfy a single criteria does not necessarily preclude issuance of a permit." The ALJ further found that under the District's rule, the failure to satisfy any one of the criteria "apparently results in the denial of a permit."
As we have previously noted, section 373.114(2), Florida Statutes (1995), gives DEP "the exclusive authority to review rules of the water management districts... to ensure consistency with the state water policy." (Emphasis added.) Subsection (2)(a) of section 373.114 states that after the adoption of a water management district rule, an affected party may request a hearing before the secretary of DEP to determine the consistency of the rule with the Water Policy Rules. Subsection (b) indicates that if DEP determines the rule to be inconsistent with the Water Policy Rules, it may order the District to amend or repeal the rule. Under subsection (c), an order of DEP "requiring amendment or repeal of a rule may be appealed to the Land and Water Adjudicatory Commission." Based on the plain language of the statute, we conclude that any challenge to rule 40D-2.301(1) on the ground that it is inconsistent with the Water Policy Rules must be heard by DEP, and DEP has exclusive jurisdiction over such matters. The ALJ recognized this principle in another context. With reference to Pinellas' challenge to the reuse provisions in the proposed subsection to BOR 3.1, the ALJ found that "consistency with State Water Policy is not properly resolved under sections 120.54 or 120.56 and does not provide a basis for invalidating an existing or proposed rule. DEP has primary authority to review water management district's rules for consistency with State Water Policy. Section 373.114(2) provides a specified procedure for affected persons to challenge the consistency of a rule with the State Water Policy. This process requires that the matter first be considered by DEP so that a consistency determination can be made by DEP." The ALJ's ruling in regard to rule 40D-2.301(1) conflicts with his ruling on the proposed subsection in BOR 3.1. He made the correct ruling on the latter issue. Accordingly, we reverse the ALJ's ruling that that portion of rule 40D-2.301(1) requiring a WUP applicant to satisfy each subsection of the rule is invalid.
The ALJ also invalidated that portion of the rules permitting an applicant to meet the conditions for issuance of a WUP by mitigating adverse impacts. He found that "by making each [of the fourteen conditions for issuance of a WUP outlined in rule 40D-2.301(1)] a separate basis for issuance of a permit while allowing certain matters to be mitigated `to the satisfaction of the District,' the existing rule structure grants unbridled discretion to the District without any meaningful basis to review the exercise of that discretion." BOR 4.0, the introduction to chapter 4 of the BOR, states: "This Chapter provides guidelines for determining whether a water use meets the Conditions for Issuance set forth in Rule 40D-2.301." BOR 4.0 goes on to state that if "the criteria described in this Chapter are not met, Applicants may consider ... mitigation, or other means to bring a proposed use into compliance with the Conditions for Issuance." In chapter 4 of the BOR, the term "to the satisfaction of the District" is not found in connection with an applicant's ability to consider mitigation. However, rules 40D-2.381(2)(l) and (m)[15] state that a permittee shall mitigate adverse impacts to existing legal uses *911 and environmental features "to the satisfaction of the District."
In reviewing rule 40D-2.301(1), it is clear that the mitigation applicants may consider to bring them into compliance goes to those criteria that seek to prevent an adverse impact to the environment, water resources, or existing legal uses. In fact, the glossary of the BOR at page B-xiv defines mitigation as: "Measures taken to prevent, lessen, or rectify adverse impacts to the water resource or existing water or land uses."
Pinellas challenged some of the language of rule 40D-2.301(1) on the ground that it is vague. Pinellas raises the ALJ's failure to invalidate rule 40D-2.302(1) on vagueness grounds as an issue on cross-appeal. The ALJ found, in regard to Pinellas' challenge, that "whether or not an adverse impact will occur is essentially a scientific determination." He also found that it "is impractical to adopt by rule a quantitative approach to delineate what constitutes an `unacceptable adverse impact' for every particular feature because of the site-specific factors involved." He further noted: "Several petitioners have alleged that the District's use of broad terms such as `unacceptable' or `adverse' impact or `significant environmental impacts' render a number of the criteria ... and the related BOR provisions, unlawfully vague and/or that these terms vest the District with unbridled discretion because no standards are provided. The use of subjective terms such as `significant' or `unacceptable' to describe the impacts that are prescribed [sic] by the rules does not automatically render the rules invalid.... It is appropriate and acceptable for the rules to allow for the exercise of professional judgment." We affirm the ALJ's ruling rejecting Pinellas' challenge to rule 40D-2.301(1) and the related BOR provisions on vagueness grounds. See Ameraquatic, Inc. v. Department of Natural Resources, 651 So.2d 114 (Fla. 1st DCA 1995) (agreeing with hearing officer's conclusion that criteria in proposed administrative rules determining conditions for issuance of permit for aquatic plant management purposes which include terms "adverse effects" and "positive or adverse impacts" in regard to numerous factors to be considered are "precise and understandable," and rejecting Ameraquatic's argument that proposed rules are invalid exercises of delegated legislative authority because they reserve unbridled discretion in agency "to define and weigh criteria regarding aquatic weed control").
If determining what constitutes an adverse impact to the environment, water resources, or existing legal uses under rule 40D-2.301(1) is a site-specific, scientific determination which allows for the use of professional judgment, then determining what measures could be taken to prevent, lessen, or rectify such an adverse impact will also be a site-specific, scientific determination allowing for the use of professional judgment. We reverse the ALJ's finding that the portion of BOR 4.0 that allows an applicant to consider mitigation in meeting the conditions for issuance of a WUP under rule 40D-2.301(1) is an invalid delegation of legislative authority because it grants unbridled discretion to the District.
In its cross-appeal, Pinellas claims that rule 40D-2.301(1) is an invalid delegation of legislative authority under section 120.52(8)(c) because it "enlarges, modifies, or contravenes the law implemented." Pinellas argues that the District has violated this principle by promulgating a fourteen-part test to replace the three-prong test of section 373.223(1) and the two-prong test of section 373.226(2), Florida Statutes (1995). We affirm the ALJ's finding that rule 40D-2.301(1) is a proper implementation of the three-prong test, and we discuss this issue only to address Pinellas' claim that the two-prong test is to be applied in perpetuity to WUP applicants whose water use predated the Florida Water Resources Act of 1972.
*912 Section 373.226 has been in continuous existence from the date of the 1972 Act, as has the three-prong test of section 373.223(1). As noted, prior to the Act, water rights were governed under the common law reasonable use rule. The Act replaced the common law with a statutory permitting system. Section 373.226(1) notes that all existing water uses, unless exempted, may be continued only with a permit. Section 373.226(2) states that the "governing board [of a water management district] or [DEP] shall issue an initial permit for the continuation of all uses in existence before the effective date of implementation of this part if the existing use is a reasonable-beneficial use ... and is allowable under the common law of this state." Section 373.226(3) states that an application for a permit under subsection (2) must be made within two years from the date of the implementation of the regulations described in the Act[16] or the use would be deemed abandoned.
Section 373.229, which governs the WUP application procedure, including what information must be included in the application itself, has been in existence in substantially the same form since the date of the Act. Section 373.239, which has also been in existence since the date of the Act, governs modifications and renewals of WUPs. Section 373.239(3) states that "[a]ll permit renewal applications shall be treated under this part in the same manner as the initial permit application." Pinellas argues that when read in pari materia with part II of chapter 373, section 373.239(3) contemplates that the two-prong test of section 373.226(2) continues to apply to applicants seeking to renew permits for water uses in existence prior to the District's implementation of the water use permitting system described in part II of the chapter.
The ALJ found that "[t]here appears to be no continuing rule in the statutory scheme for the two-prong test of section 373.226(2) two years after the effective date of the implementation of a consumptive use permitting program by the District. Reference in section 373.226 to whether a use was `allowable under the common law of the state' tends to confirm that this two-prong test was a one-time transitional procedure for converting common law uses to permitted uses." The ALJ went on to find that "if the legislature had intended to create a favored position for the renewal of uses that predated the permitting program, that intent would have been more explicitly spelled out. The authors of the Model Water Code specifically contemplated and rejected such a preference. See Commentary to Model Water Code, p. 183. There is no clear indication that the Florida Legislature intended to adopt a renewal process for common law uses that is directly contrary to the position of the authors of the Model Water Code." The ALJ further found that "[i]n adopting the Florida Water Resources Act, the legislature clearly intended to supplant the common law allocation system. Consistent with this goal, the purposes of chapter 373 are best served by making all applicants subject to the three-prong test on permit renewal, regardless of whether the use predated the origination of the permitting program. No statutory purpose is served by the continuing vestiges of the common law allocation system."
We agree with the ALJ's determination that the legislature did not intend to allow vested common law water rights to exist ad infinitum alongside a statutory-permitting system, and we also agree with his interpretation of the two-prong test of section 373.226(2) "as simply a transitional tool for implementation of the Florida Water Resources Act." We note that the use of the term "in the same manner" as used in the provision in section 373.239(3) has an understood meaning in Florida law as being in the same procedural manner. See *913 Terry v. Ferreria, 51 So.2d 426, 427 (Fla. 1951) ("The phrase `in the same manner' has a well-understood meaning in legislation, and that meaning is not one of restricting or limitation, but of procedure. It means by similar proceedings, so far as such proceedings are applicable."). Thus, under section 373.239(3), all permit renewal applications are subject to the same procedural process as the initial permit application. As we have noted, the procedural process is outlined in section 373.229.
Pinellas argues that the requirement that the fourteen conditions for issuance in rule 40D-2.301(1) be satisfied on both "an individual and a cumulative" basis is vague and is, therefore, an invalid exercise of delegated legislative authority in derogation of section 120.52(8)(d), Florida Statutes (1995). The ALJ found that only subsections (b), (c), (d), (f), (g), (h), (i), and (n) involve cumulative analysis and that "[w]hile the wording of the rule is somewhat confusing, the remaining criteria by their very nature, can only be applied on an individual basis." The ALJ further found that for "any regulatory scheme to be effective, there has to be an ability to take cumulative impact into account." In Village of Tequesta v. Jupiter Inlet Corp., 371 So.2d 663 (Fla.1979), our supreme court concluded that the reasonableness of a given water use depends upon many variables, including "the reasonable demands of other users." 371 So.2d at 670. In 1997, the legislature amended the "Declaration of Policy" section of chapter 373 to add the mandate that DEP and the water management districts "take into account cumulative impacts on water resources and manage those resources in a manner to ensure their sustainability." § 373.016(2), Fla.Stat. (1997); ch. 97-160, § 1, at 3004, Laws of Fla. The ALJ noted that the determination of cumulative impact "unavoidably involves site-specific considerations which render it impractical to adopt rule criteria that can be applied with `cookie cutter' certainty." Pinellas does not claim that this factual finding was not based upon competent, substantial evidence.
We affirm, without discussion, the order of the ALJ as it relates to all other challenges by Pinellas to the validity of rule 40D-2.301(1). We note, however, that the ALJ invalidated rule 40D-2 .301(1)(j) on the ground that it requires that an applicant exhaust local water resources before an application from a more remote source will be considered and is thus not authorized by chapter 373. The parties dispute whether the ALJ invalidated subsection (h) of the rule, which required that a water use "[w]ill not adversely impact offsite land uses existing at the time of the application." Section 4.7 of the BOR provides guidance in regard to this subsection. The ALJ stated: "Because a reasonable person cannot discern what land uses would be included under these [rule 40D-2.301(1)(h) and BOR 4.7] and/or what point in time [the land uses] must have been in existence in order to be protected, the provisions are defectively vague." Thus, the ALJ invalidated subsection (h) of the rule and BOR 4.7, along with subsection (j) of the rule. Because none of the parties challenged these invalidations, we do not disturb the ALJ's ruling as to BOR 4.7 and subsections (h) and (j) of rule 40D-2.301(1).
The ALJ invalidated the proposed portion of BOR 3.1 that required applicants for WUPs in the SWUCA to investigate the "feasibility of the use of reclaimed water," and that "reuse shall be required where economically, environmentally and technically feasible."[17] The ALJ found *914 that there was no statutory authority for the District to require reuse. The ALJ did find, however, that "[t]he importance of conservation and reuse are implicit in the reasonable-beneficial use test and the regulation of water use in the public interest and have been recognized in the State Water Policy for some time." In this regard, rule 62-40.416(2) of the FAC states that "[i]n implementing consumptive use permitting programs, a reasonable amount of reuse of reclaimed water shall be required within designated water resource caution areas, unless objective evidence demonstrates that such reuse is not economically, environmentally, or technically feasible." We conclude that the proposed portion of BOR 3.1 requiring reuse is authorized under the three-prong test of section 373.223(1) that requires that a use be reasonable-beneficial and in the public interest. Reasonable-beneficial is defined as "the use of water in such quantity as is necessary for economic and efficient utilization for a purpose and in a manner which is both reasonable and consistent with the public interest." § 373.019(4), Fla. Stat. (1995). There is no dispute among the parties that the aquifer is being overused and the lake levels are declining in the SWUCA region, and the evidence showed that saltwater is intruding into the aquifer along the coastal counties. If reuse were "economically, environmentally and technically feasible," then using groundwater or water from the aquifer would by definition not be an "efficient utilization ... consistent with the public interest." § 373.019(4).
Although the ALJ found the importance of reuse is "implicit in the reasonable-beneficial use test," he found that subsection 373.250(2)(b), Florida Statutes (1995), "implicitly limits a water management district's ability to require the use of reclaimed water as part of a WUP to situations where it can be shown that reused water is available." Subsection (1) of section 373.250 states in part that the "encouragement and promotion of water conservation and reuse of reclaimed water, as defined by the department, are state objectives and considered to be in the public interest." Subsection (2)(b) states: "Reclaimed water may be presumed available to a consumptive use permit applicant when a utility exists which provides reclaimed water, which has uncommitted reclaimed water capacity, and which has distribution facilities, which are initially provided by the utility at its cost, to the site of the affected applicant's proposed use." However, subsection (4) states that "[n]othing in this section shall impair a water management district's authority to plan for and regulate consumptive uses of water under this chapter." We conclude, therefore, that section 373.250(2)(b) does not limit a water management district's authority to require reuse under the reasonable-beneficial test and that it merely allows a water management district to presume reclaimed water is available to a WUP applicant when certain conditions are met.
The ALJ found that for a water management district to require reuse is an invalid exercise of delegated legislative authority because the legislature in section *915 403.064(2), Florida Statutes (1995), required applicants for permits to construct or operate a wastewater facility to prepare a reuse feasibility study, but, in section 403.064(3), left the determination of feasibility up to the applicant. The proposed portion of BOR 3.1 on reuse leaves the determination of feasibility up to the District. Thus, the ALJ found that the District was preempted by section 403.064(3) from having the final determination regarding reuse feasibility in a WUP application. The ALJ, however, noted that "section 403.064(3) only specifically addresses reuse as part of the water quality permitting of discharge from a wastewater treatment plant."
Chapter 403 is entitled "Environmental Control." Part I of chapter 403 is entitled "Pollution Control"; section 403.064 is included therein. Section 403.064(2) addresses the provision of reclaimed water in the wastewater treatment facility permitting process. The legislature mandated that permit applicants "serving a population located within, or discharging within a water resource caution area" look into the feasibility of reuse. The proposed portion of BOR 3.1 requires reuse under certain conditions in connection with obtaining a permit to use water, a completely different circumstance. Furthermore, section 403.064(5) clearly contemplates that water management districts may require reuse feasibility studies as it states: "A reuse feasibility study prepared under subsection (2) satisfies a water management district requirement to conduct a reuse feasibility study imposed on a local government or utility that has responsibility for wastewater management." Water management districts do not have authority to regulate wastewater treatment plant discharge; this authority resides with DEP. See §§ 403.061, 403.064(1), Fla.Stat. (1995). Such a feasibility study as contemplated by section 403.064(5) could be imposed only in the context of a WUP application. Section 403.064(5) does not state that the decision of the local government or utility regarding feasibility is final, and it would be illogical to provide water management districts with the authority to require a reuse feasibility study but not to provide them with the authority to require reuse where the use of reclaimed water would be reasonable-beneficial and in the public interest.
The ALJ also found that, because "there are no standards or objective criteria to review the exercise of the District's discretion in determining whether a reuse system is `economically, environmentally, and technically feasible,' proposed BOR section 3.1 is vague and grants unbridled discretion to the District." It is apparent that the ALJ found the rule to be invalid on its face. In regard to the District's argument at the trial level that any perceived deficiency in the proposed section could be cured by a preapplication conference, the ALJ found in his order that "the rules must be evaluated on their face and the District's willingness to provide such conferences does not alter the unbridled discretion inherent in the rules." The ALJ further found that "the proposed SWUCA rule does not even list the factors the District would consider in making its determination."
An administrative rule is invalid under section 120.52(8)(d) if it requires the performance of an act in terms that are so vague that men of common intelligence must guess at its meaning. See Cole Vision Corp. v. Department of Bus. & Prof'l Regulation, 688 So.2d 404 (Fla. 1st DCA 1997); Witmer v. Department of Bus. & Prof'l Regulation, 662 So.2d 1299 (Fla. 4th DCA 1995). The general rule is that where the legislature has not defined words or phrases used in a statute, they must be "construed in accordance with [their] common and ordinary meaning." Donato v. American Tel. & Tel. Co., 767 So.2d 1146 (Fla.2000). "[T]he plain and ordinary meaning of [a] word can be ascertained by reference to a dictionary." Green v. State, 604 So.2d 471 (Fla.1992). However, there are variations on the general *916 rule of statutory interpretation regarding words being given their common and ordinary meaning. The supreme court has stated that "consideration must be accorded not only to the literal and usual meaning of the words, but also to their meaning and effect on the objectives and purposes of the statute's enactment." Florida Birth-Related Neurological Injury Compensation Ass'n v. Division of Admin. Hearings, 686 So.2d 1349, 1354 (Fla. 1997). The supreme court has also held that words in a statute "must be construed according to their plain and ordinary meaning, or according to the meaning assigned to the terms by the class of persons within the purview of the statute." Florida E. Coast Indus., Inc. v. Department of Community Affairs, 677 So.2d 357, 362 (Fla. 1st DCA 1996). Sneed v. State, 736 So.2d 1274, 1276 (Fla. 4th DCA 1999) (quoting Green v. Bock Laundry Mach. Co., 490 U.S. 504, 527, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989)), held that "[t]he meaning of terms on the statute books ought to be determined ... on the basis of which meaning is (1) most in accord with context and ordinary usage ... and (2) most compatible with the surrounding body of law into which the provision must be integrated." (First ellipsis in original.) The Fourth District also held in WFTV, Inc. v. Wilken, 675 So.2d 674, 679 (Fla. 4th DCA 1996), that a "statutory phrase should also be viewed not only in its internal context within the section, but in harmony with interlocking statutes."
In invalidating the proposed portion of BOR 3.1 on the basis that the term "economically, environmentally and technically feasible" was vague, the ALJ did not find the term itself was incapable of comprehension or that men of common intelligence would have to guess at its meaning. Rather, he found that the term was too broad or general because it lacked standards or objective criteria that would further define "the factors the District would consider in making its determination." In reviewing the term "economically, environmentally, and technically feasible," the word "feasible" has a plain and ordinary meaning that is applicable here. It is defined as "capable of being brought about"; "possible." The American Heritage College Dictionary 499 (3d ed.1993). "Economically feasible" is easily understood as financially feasible or financially "doable." The term "economically feasible" is used in a myriad of legislative provisions. See, e.g., §§ 373.461(1)(a), 163.3177(2), 311.105(1)(e), 364.052(5), 388.4111(2)(c), 403.702(2)(a), 403.704(17), 403.707(6)(c), 420.5087(4), 479.02(6), Fla. Stat. (1999). "Economically feasible" in the context of the proposed portion relates to the financial ability of a WUP applicant to institute reuse.
The word "technically" has a common and ordinary meaning. "Technically" pertains to "scientific," "industrial and mechanical," "technological," and "having special skill or practical knowledge esp. in a mechanical or scientific field." The American Heritage College Dictionary 1392 (3d ed.1993). The term "technologically feasible" is also used in legislative enactments. See, e.g., §§ 287.045(5), 373.0421(1)(b)(1), 373.223(3)(c), 373.461(1)(a), 376.031(22), 934.15(1)(d), Fla. Stat. (1999). Under section 373.223(3)(c), Florida Statutes (1999), when determining whether, under certain specified conditions, the potential transport and use of ground water across county boundaries is consistent with the public interest, the governing board of a water management district is instructed to consider "[a]ll economically and technically feasible alternatives to the proposed [water] source, including, but not limited to, desalination, conservation, [and] reuse of nonpotable reclaimed water." (Emphasis added.) Chapter 376 is entitled "Pollution Discharge Prevention and Removal." Section 376.031, Florida Statutes (1999), contains the definitions for chapter 376; subsection 376.031(22), states that "`technically feasible' means that given available technology, a restoration project can be successfully completed." In the proposed portion of *917 BOR 3.1, the term "technically feasible" clearly means that given the currently available technology, the WUP applicant could successfully institute reuse. (Of course, it may not be economically feasible for the applicant to purchase or otherwise utilize the current technology for reclaiming water.)
The use of the term "environmentally feasible" in the proposed portion of BOR 3.1 is more problematic. "Environmental" pertains to "of or relating to the environment," "relating to or concerned with the ecological impact of altering the environment," and "of or relating to potentially harmful factors originating in the environment." The American Heritage College Dictionary 460 (3d ed.1993). Section 187.101(3), Florida Statutes (1999), states that the "goals and policies contained in the State Comprehensive Plan [for the orderly social, economic, and physical growth of the state] shall be reasonably applied where they are economically and environmentally feasible." (Emphasis added.) In the context of the proposed portion of BOR 3.1, we conclude that "environmentally feasible" relates to whether reuse can be accomplished within the bounds of environmental protection regulations. As stated earlier, section 373.016(3), Florida Statutes (1995), vests the DEP with the power "to accomplish the conservation, protection, management, and control of the waters of the state ... through delegation of appropriate powers to the various water management districts." DEP has the power and duty to prohibit pollution of air and water. See § 403.061, Fla.Stat. (1995). In preparing a reuse feasibility study under section 403.064(2)(e), an applicant to construct or operate a wastewater treatment facility must include an "[e]valuation of economic, environmental, and technical constraints." In reading the term "environmentally feasible" in the proposed portion concerning reuse of BOR 3.1 in harmony with and compatible with chapter 373 and section 403.064, as well as part I of chapter 403, we find the meaning stated above to be clear and obvious.
As we previously stated, the ALJ found that the term "economically, environmentally and technically feasible" was both vague and granted unbridled discretion because it was too broad and lacked further definition, and he found the proposed portion to be invalid on its face. The only factual finding the ALJ made in regard to the proposed portion was that the "determination of feasibility in developing a reuse system necessarily involves consideration of a variety of factors which are technical in nature and site-specific." Kenneth A. Weber, Chief Regulation Geologist for the District, testified that a determination of feasibility under the proposed portion of BOR 3.1 on reuse is a site-specific determination. Whether reuse is environmentally feasible is clearly a scientific, technical, site-specific determination. Whether reuse is economically feasible is a determination specific to each individual WUP applicant. Mark Hammond, Manager of the Conservation Projects Section of the Resource Projects Department for the District, also testified that this was the case. "The sufficiency of a rule's standards and guidelines may depend on the subject matter dealt with and the degree of difficulty involved in articulating finite standards." Cole Vision Corp. v. Department of Bus. & Prof'l Regulation, 688 So.2d 404, 410 (Fla. 1st DCA 1997). We conclude that here, where the considerations are site-specific as the ALJ found, or specific to the individual WUP applicant as are the economic considerations, the proposed portion of BOR 3.1 regarding reuse is not vague because the District failed to or was unable to articulate more refined criteria, nor does it vest unbridled discretion in the District.
Pinellas next argues that the proposed portion of BOR 3.1 is inconsistent with section 125.01(1)(k)(1), Florida Statutes (1995). Section 125.01(1) states that the
legislative and governing body of a county shall have ... [t]o the extent not *918 inconsistent with general or special law... the power to:
. . . .
(k)1. Provide and regulate waste and sewage collection and disposal, water and alternative water supplies, including, but not limited to, reclaimed water and water from aquifer storage and recovery and desalination systems, and conservation programs.
(Emphasis added.) Section 373.217(3), Florida Statutes (1995), states that if any part of the Florida Water Act as set forth in sections 373.203-.249 is in conflict with any state law or local ordinance, that portion of the Florida Water Act controls. Because we held that the proposed portion of BOR 3.1 regarding reuse is authorized under the reasonable-beneficial and public interest test, section 373.223 controls over § 125.01(1)(k)(1). Moreover, the proposed portion of BOR 3.1 does not limit a county's power to provide and regulate reclaimed water. It merely makes it a condition of obtaining a WUP permit that an applicant investigate the feasibility of the use of reclaimed water and use it where "economically, environmentally and technically feasible." Section 125.01(1)(k)(1) does not give counties the exclusive power to provide and regulate reclaimed water. As noted above, section 403.064(5) contemplates that water management districts may require reuse feasibility studies and it would be illogical for a water management district to have the authority to require such a study but not have the authority to require reuse. We therefore reverse the ALJ's invalidation of the proposed addendum to section 3.1 of the BOR under the heading, "Reuse Feasibility Investigation Within the SWUCA."
We next focus on the ALJ's invalidation of existing BOR 7.3.6.4 and the proposed portion of BOR 3.1 requiring certain WUP applicants to investigate the feasibility of desalination and implement it if feasible. Existing BOR 7.3.6.4 applies within the Northern Tampa Bay Water Use Area and reads as follows:
All industrial and public supply applicants for new quantities shall be required to investigate the feasibility of desalination to provide all or a portion of requested quantities. This requirement shall be implemented by applying the following permit condition to all applicable permits:
The Permittee shall investigate the feasibility of desalination to provide all or a portion of the requested quantities, and to implement desalination if feasible. The report of this investigation shall be submitted with any application for new quantities, and shall include a detailed economic analysis of desalination, including disposal costs, versus development of fresh water supplies, including land acquisition and transmission costs.
The proposed portion of BOR 3.1 is intended to apply to the SWUCA and is similar, but not identical, to existing BOR 7.3.6.4:
All industrial and public supply applicants within the SWUCA for new or replacement quantities of ground water of 500,000 gpd annual average quantities or greater where salt water exists shall be required to investigate the feasibility of desalination to provide all or a portion of requested quantities, and to implement desalination if feasible. This investigation shall include a detailed economic analysis of desalination, including disposal costs, versus development of fresh water supplies, including land acquisition and transmission costs. This provision applies to desalination of Gulf of Mexico waters and other coastal waters and only as applicable to ground water users with permits of 500,000 gpd annual average quantities or greater that are located in coastal counties within the SWUCA.
The ALJ invalidated existing BOR 7.3.6.4 and proposed BOR 3.1 on the grounds that they were an invalid exercise of delegated authority because they were *919 vague and vested unbridled discretion in the District. The ALJ found that the three-prong test "in its current form does not authorize the imposition of a requirement on certain classes of applicants [industrial and public supply applicants] to evaluate the potential of desalination when there is no facility currently producing excess desalinated water and no such facility is even in the planning process."[18] We conclude that the District has the authority to require WUP applicants to investigate desalination and implement it where feasible as part of the reasonable-beneficial and public interest prongs of the three-prong test under section 373.223. Furthermore, as noted by the District, industrial and public supply applicants, in contrast to other applicants such as agricultural applicants, are likely to be the only ones with the resources and potential for site acquisition. With regard to the expense of conducting a feasibility study, the cost of compliance is unrelated to whether a water management district has the statutory authority to implement a proposed rule, and there is no provision in chapter 373 which precludes the regulation of water use because of the cost of complying with the regulation. The District concedes that it cannot mandate that an applicant build a desalination plant, and if a WUP applicant refuses to implement desalination, even though feasible, the District's remedy is to deny them some of the water that they are seeking in their new application. This would also apply where an applicant refuses to implement reuse where it is economically, environmentally, and technically feasible.
The ALJ also found that the "requirement to prepare a desalination study is unacceptably vague because it provides little guidance as to what should be included in such a study and it grants unbridled discretion to the District in determining whether the study is acceptable and/or the project reasonable without any meaningful basis to review that decision." First, with regard to the requirement that a WUP applicant "implement desalination if feasible," in reading the word "feasible" in harmony with the proposed portion of BOR 3.1 requiring reuse, we determine "feasible" to mean economically, technically, and environmentally feasible. See WFTV, Inc. v. Wilken, 675 So.2d 674 (Fla. 4th DCA 1996). We also note that, as he did with reuse, Mr. Weber testified that the feasibility of desalination for a particular applicant is a site-specific determination. Thus, the requirement to implement desalination, if feasible, does not vest unbridled discretion in the District, nor is it vague because of the District's failure to articulate more finite standards. See Cole Vision Corp. v. Department of Bus. & Prof'l Regulation, 688 So.2d 404 (Fla. 1st DCA 1997). Last, the scope of the investigation is inherent in the rule itself, and it is not, therefore, an invalid exercise of delegated legislative authority. Accordingly, we reverse the ALJ's invalidation of existing BOR 7.3.6.4 and the proposed portion of BOR 3.1 regarding desalination.
Next, the ALJ invalidated the proposed section of BOR 3.6 which provides:
A wholesale public supply customer within the SWUCA shall be required to obtain a separate permit to effect the conservation requirements set forth in this section, unless the quantity obtained by the wholesale public supply customer is less than 100,000 gallons per day on an annual average basis and per capita daily water use of the wholesale public supply customer is less than the applicable per capita daily water use requirement outlined in Section 3.6, in the subsection titled "PERMIT QUANTITIES AND COMPLIANCE PER CAPITA WATER USE WITHIN THE SWUCA."
*920 The ALJ upheld those proposed portions of BOR 3.6 that require public supply permittees to meet the overall maximum adjusted gross per capita water use rate, currently 130 gallons per day, to be reduced to 110 gallons per day by 2004. However, many public supply permittees resell water to wholesale users pursuant to contracts that have been in existence for many years. (For example, Manatee County, as a public supply permittee, resells water, pursuant to existing contracts, to the Town of Longboat Key and the City of Palmetto.) These wholesale users are not obligated to implement the conservation measures required to bring the daily average use within the permitted limits. The public supply permittee would then have to compensate for the wholesale customer's refusal to implement conservation measures by imposing off-setting limitations on use by the public supply authority's retail customers or face enforcement action by the District. The proposed section of BOR 3.6 at issue was designed to remedy this problem by requiring wholesale public supply customers located within the SWUCA to obtain separate permits that would subject them to the same water conservation requirements demanded of the public supply permittees from whom they are purchasing their water.
While recognizing that the proposed portion of BOR 3.6 is "consistent with the overall purposes of chapter 373," the ALJ nevertheless found that it was an invalid delegation of legislative authority. The ALJ found that section 373.219(1), Florida Statutes (1995), only authorizes the District to require water use permits for the "consumptive use of water." He further found that the "District's proposed requirement in BOR section 3.6 ... impermissibly enlarges and extends section 373.219(1) to an individual or entity receiving water from a permittee." The ALJ noted that although chapter 373 does not define the term "consumptive use," "water" is defined in section 373.019(8), Florida Statutes (1995), as "any and all water on or beneath the surface of the ground or in the atmosphere, including natural or artificial watercourses, lakes, ponds, or diffused surface water and water percolating, standing, or flowing beneath the surface of the ground, as well as coastal waters within the jurisdiction of the state." The ALJ reasoned that "water that has been withdrawn from the ground and that is in the control of a permittee does not fall within the statutory definition of water."
In the introduction to chapter 373, in section 373.019, Florida Statutes (1995), entitled "Definitions," the legislature stated that "the following words shall, unless the context clearly indicates otherwise," have the meanings given to them in that section. Section 373.219(1) states that "[t]he governing board [of a water management district] ... may require such permits for consumptive use of water and may impose such reasonable conditions as are necessary to assure that such use is consistent with the overall objectives of the district ... and is not harmful to the water resources of the area." The only specific exclusion to the permit requirement is the "domestic consumption of water by individual users." We conclude that in the context of section 373.219, the word "water" as used in the term "consumptive use of water" must have a more expansive definition than that given in section 373.019(8). We note that section 373.019(8) gives the same definition to "water" as to "waters in the state." It is clear that section 373.019(8) refers primarily to water in its natural habitatin the ocean, in lakes or ponds, or in the atmosphere, as well as water that has gathered in artificial watercourses. Thus, it refers to water that has not yet been harnessed for consumption. Section 373.219(1) gives the water management districts authority over the consumption of water and allows them to impose reasonable conditions over how it is used. We conclude that the word "water" in the term "consumptive use of water" in section 373.219(1) refers to water in its consumptive statewater that has already been harnessed for consumption. We, therefore, *921 hold that the District has authority to require wholesale public supply customers within the SWUCA to obtain a separate permit to effect the conservation requirements set forth in BOR 3.6.
Pinellas argues that there are no criteria within the proposed portion of BOR 3.6 explaining what is a "wholesale public supply customer within the SWUCA." Because the ALJ invalidated the rule on the ground that it lacked statutory authority, he did not decide this issue. However, he did find that the "testimony at the hearing indicated some confusion or uncertainty as to whether a wholesale customer of a utility located in the SWUCA would be required to obtain a separate WUP if that customer is located outside the SWUCA." Mr. Weber testified at the hearing that only a wholesale customer physically located within the SWUCA must obtain a permit. That construction is consistent with the plain language of the rule. Thus, a wholesale customer physically located outside of the SWUCA would not be required to obtain a permit.
Pinellas argues that the proposed portion of the rule is arbitrary and capricious because the District did not provide a reasonable explanation why wholesale customers who use under 100,000 gallons per day are exempted. To the contrary, Mr. Weber testified that the proposed portion of BOR 3.6 was intended to cover wholesale customers with sophisticated distribution systems and not mobile home parks and the like. Wholesale customers who use less than 100,000 gallons per day are to be exempted as long as their per capita daily use is less than the applicable daily use requirement set forth in BOR 3.6. Clearly, the proposed portion of BOR 3.6 concerning wholesale customers is neither unsupported by logic, nor despotic or irrational. See Florida League of Cities, Inc. v. Department of Envtl. Regulation, 603 So.2d 1363 (Fla. 1st DCA 1992).
Pinellas also argues that because the District intends to impose the SWUCA per capita provisions on wholesale customers located outside of the SWUCA, there is no rational basis for the proposed portion of BOR 3.6 at issue. The ALJ found as follows: "In allocating quantities to public suppliers drawing water in the SWUCA, the District would consider the entire demand area and allocate a quantity based on the applicable SWUCA per capita rate. In other words, a supplier drawing water from a point within the SWUCA would receive an allocation for the wholesale customer outside the SWUCA based upon the SWUCA per capita rate even." Mr. Weber's testimony supported the ALJ's findings in this regard. As noted, the ALJ upheld the proposed per capita use portions of BOR 3.6 that would reduce the per capita water use rate from the present quota of 130 gallons to 110 gallons in 2004. The ALJ found that this means the District allots a per capita use rate for the permittee/supplier and also for any wholesale customer that it supplies, whether physically located inside or outside of the SWUCA. As the allotted per capita rate reduces for the permittee, it correspondingly reduces for the wholesale customer. However, if the permittee has a contract to sell a certain number of gallons to the wholesale customer in excess of the District's per capita allowance, it would then have less than the District's per capita allowance available for its own customers. The section of proposed BOR 3.6 at issue would remedy this, at least with regard to wholesale customers physically located within the SWUCA, by limiting them to per capita water use amounts set forth in BOR 3.6. Clearly, there is a rational basis underlying the proposed portion of BOR 3.6 that requires wholesale public supply customers within the SWUCA to obtain a separate permit.
Pinellas makes a cursory argument that the proposed portion of BOR 3.6 violates the constitutional prohibitions against the impairment of contracts of Article I, Section 10, Clause 1 of the United States Constitution and Article I, Section 10 of the Florida Constitution in that the *922 District cannot, by rule, supersede a wholesale customer's contractual right to purchase a certain amount of water from a permittee. Pinellas did not raise this argument below, acknowledging that the ALJ did not have the jurisdictional authority to decide the issue. See Key Haven Associated Enters., Inc. v. Board of Trustees of the Internal Improvement Trust Fund, 427 So.2d 153 (Fla.1982); Florida Pub. Employees Council 79, AFSCME v. Department of Children & Families, 745 So.2d 487 (Fla. 1st DCA 1999). We note that a law is constitutional even if it impairs the obligations of private contracts if there is a significant and legitimate public purpose behind the enactment of the law. See United States Fidelity & Guar. Co. v. Department of Ins., 453 So.2d 1355 (Fla. 1984); Brevard County v. Florida Power & Light Co., 693 So.2d 77 (Fla. 5th DCA 1997). However, "the regulation must not unreasonably intrude into the parties' bargain to a greater degree than is necessary to achieve the stated public purpose." Brevard County, 693 So.2d at 81. Here, the proposed portion of BOR 3.6 serves the legitimate public purpose of water conservation. It also serves to protect the interests of the customers of public supply permittees where those public supply permittees have contracted with wholesale customers to sell the wholesale customers an amount of water over the per capita use rates established by the District. However, this issue is not before us, and we do not decide it at this time.
We reverse the ALJ's invalidation of the proposed portion of BOR 3.6 requiring wholesale customers within the SWUCA to obtain a separate permit to effect the conservation requirements set forth in that section.
In its cross-appeal, Pinellas argues that the ALJ erred in not invalidating existing BOR 7.3.1.2 and the proposed portion of BOR 3.6 that require water supply utilities to adopt "a water-conserving rate structure." BOR 7.3.1.2 applies in the Northern Tampa Bay Water Use Caution Area, and the proposed portion of BOR 3.6 applies in the SWUCA.
Addressing this issue, Pinellas first argues that there is no express or implied statutory authority for the rules; however, the ALJ correctly found that "[c]onsideration of a utilities' conservation efforts, including its rate structure, is appropriate in determining water allocations and applying the reasonable-beneficial use and public interest elements of the three-prong test of section 373.223(1)." Pinellas then argues that section 367.011(2) grants the Florida Public Service Commission (PSC) exclusive jurisdiction over water rates. The ALJ found that the existing rule and the proposed rule "do not conflict with the power of the PSC or local governments to regulate rates. To the extent that the District reviews the rates at all, it is simply to analyze how they are structured and interact. The rules afford public utilities wide latitude in adopting its rate structure so long as the effect is to send a price signal to consumers to encourage water conservation." The ALJ also observed that "the water-conserving rate structure requirements of the SWUCA Rules are specifically conditioned on a permittee obtaining PSC approval of such rates." The facts of Sandpiper Homeowners Ass'n v. Lake Yale Corp., 667 So.2d 921 (Fla. 5th DCA 1996), indicate that the St. Johns Water Management District had required a public water utility to adopt an inverted rate structure,[19] which is a water-conserving rate structure. The PSC approved the rate and granted the necessary certificate to the utility. The regulatory interplay between the PSC and the water management district was not an issue in the case.
Pinellas further argues that section 153.11(1)(b), Florida Statutes (1995), gives the county commission authority over water *923 rates and that the rates "shall not be subject to supervision or regulation by any other commission, board, bureau or agency of the county or of the state or of any sanitary district or other political subdivision of the state." The ALJ found that: "The autonomy over rates granted by the statute is intended to insure the operational capabilities of a utility and preclude conflict with existing bond covenants which could severely impact the financial standing of the county or municipality. Autonomy over rates should not be construed to imply exemption from the permitting requirements of chapter 373. The District has broad authority under chapter 373 to allocate water and, like all users, a public utility's use must be reasonable-beneficial and in the public interest." We agree with the ALJ's finding and note again that the legislature has mandated that if any portion of section II of the Florida Water Act is in conflict with any other state law, that portion of the Florida Water Act controls. Thus, in this instance, should there have been a conflict, section 373.223(1) would control over section 153.11(1)(b).
Pinellas also sought to invalidate the rules on the basis that they are vague and vest unbridled discretion in the District because the evidence established that there is no universally accepted definition in the water industry identifying what types of rate structures are "water-conserving." However, the ALJ found that "the evidence established that the general concept as to what constitutes a water-conserving rate structure is well recognized in the industry. The basic concept of a water-conserving rate structure is that the charges for water go up as the customer uses more." Pinellas has failed to show that this finding is not based on competent, substantial evidence. Thus, we affirm the ALJ's finding that existing BOR 7.3.1.2 and the proposed portion of BOR 3.6 which require water supply utilities to adopt a water-conserving rate structure are not invalid.
We also affirm, without discussion, the ALJ's ruling regarding the remainder of the issues Pinellas raises in its cross-appeal.
Finally, we decline to rule on those issues which became moot when the District withdrew the rules in question. The Environmental Confederation of Southwest Florida (ECOSWF) challenged the ALJ's finding that in determining what is "significant harm" under section 373.042, Florida Statutes (1995), which mandates the establishment and implementation of minimum flows and levels, societal interests must be taken into consideration rather than basing the determination on purely scientific levels. The District withdrew the portion of the rules relating to minimum flows and levels and is engaged, with the input of ECOSWF, in the process of promulgating new rules. As we have said, we do not address this issue because it is moot. However, we recognize that the establishment and implementation of minimum flows and levels is a decision that is of the utmost importance to the citizens who live within the District's jurisdiction and one that will affect future generations. There was significant evidence presented at the hearing regarding the intrusion of saltwater into the freshwater aquifer. The ALJ found that the "best computer model simulations indicate that along the coast of the SWUCA, there has been one to two miles of saltwater intrusion into the [Upper Floridian Aquifer System][20] from predevelopment times to the present."
Accordingly, for the reasons we have expressed, the order of the ALJ is:
AFFIRMED IN PART AND REVERSED IN PART.
PARKER, A.C.J., and CASANUEVA, J., concur.
NOTES
[1] The District did not challenge every ruling of the ALJ in the order that invalidated its existing or proposed rules or agency statements.
[2] Section 120.52(8) was amended effective October 1, 1996, subsequent to the evidentiary hearing in this matter but prior to the entry of the order. Further material was added to the statute, including the admonition that "[n]o agency shall have authority to adopt a rule only because it is reasonably related to the purpose of the enabling legislation and is not arbitrary and capricious." However, the District did not defend any of the rules on the ground that they were reasonably related to the enabling legislation. The ALJ noted in his order that all the citations therein are to the pre-1996 version of chapter 120, the Administrative Procedure Act (APA), and that none of the amendments to the APA would have affected his rulings in this case.
[3] A water use caution area or "water resource caution area" is an area designated by the District pursuant to rule 62-40.520 of the Florida Administrative Code that the District has determined currently has critical water supply problems or that such problems will occur within the next twenty years.
[4] See ch. 72-299, Laws of Fla.
[5] See Frank E. Maloney, et al., A Model Water Code (1972).
[6] This statute is renumbered as section 373.016(5), Florida Statutes (1999).
[7] The Department of Environmental Protection was previously known as the Department of Environmental Regulation.
[8] The state Water Policy Rule has been renamed the Water Resource Implementation Rule. See § 373.036(1)(d), Fla.Stat. (1999).
[9] In June 2000 the term "water policy goals" was amended to read "water resource implementation goals."
[10] This section was amended in 1998. See ch. 98-200, § 83, Laws of Fla. It now reads: "In administering the provisions of this chapter the governing board has authority to adopt rules pursuant to ss. 120.536(1) and 120.54 to implement provisions of law conferring powers or duties upon it." § 373.113, Fla.Stat. (1999).
[11] Previously section 120.535(2), Florida Statutes (1993).
[12] Previously section 120.52(16), Florida Statutes (1993).
[13] The incorporation by reference was pursuant to section 120.54(8), Florida Statutes (1993), now authorized in substantially similar form by section 120.54(1)(i), Florida Statutes (1999).
[14] Now renumbered as rule 62-40.410(2).
[15] The District did not challenge the ALJ's invalidation of these rules.
[16] Rule 40D-2.031 indicates that a program for the issuance of permits authorizing the consumptive use of water was in place in the District by August 3, 1977.
[17] The provision at issue appears as a proposed addendum to section 3.1 of the BOR, under the heading, "Reuse Feasibility Investigation Within the SWUCA":

Investigation of the feasibility of the use of reclaimed water (reuse) shall be required within the SWUCA for all uses, and reuse shall be required where economically, environmentally and technically feasible. For those water use permittees also required to investigate reuse pursuant to Section 403.064, F.S., the investigation shall be in accordance with Section 403.064, F.S., and any rules promulgated thereunder. Reclaimed water suppliers whose reclaimed water is 100% reused, reclaimed water users whose water use is 100% reclaimed water, and permittees with a reuse plan already accepted by the District, shall not be required to conduct a reuse feasibility study. Reuse of reclaimed water as an alternate, replacement or supplemental water source for irrigation, industrial process, cleaning, or other non-potable use shall be investigated by all appropriate applicants or permittees. Applicants for these water uses shall provide an analysis of reclaimed sources for the area, including the relative location of these sources to the Permittee's property, the quantity and timing of reclaimed water availability, costs associated with obtaining the reclaimed water, the suitability of reclaimed water for the intended use, and an implementation schedule for reuse. Infeasibility shall be supported with a detailed explanation.
[18] There is currently a desalination facility planned within the District, which is scheduled to begin operations by December 31, 2002. See Douglas Jehl, Tampa Bay Looks to the Sea to Quench Its Thirst, N.Y. Times, Mar. 12, 2000.
[19] An inverted rate structure is one in which a customer is "charged for water such that the greater the volume used, the greater the rate per gallon." Sandpiper Homeowners Ass'n v. Lake Yale Corp., 667 So.2d 921, 922 (Fla. 5th DCA 1996).
[20] The Upper Floridian Aquifer System is the most highly developed and productive limestone reservoir in west-central Florida and is the lowest cost source of high quality fresh water in southwest Florida.