SHEPHERD, J.,
dissenting.
This is an appeal from a final order decertifying a class and dismissing an amended class action complaint on the ground that the named plaintiffs, former unit owners in the Ocean Beach Resort Condominium, lacked standing to pursue an action for damages under a windstorm policy of insurance issued by Citizens Property Insurance Corporation to the Ocean Beach Resort Condominium Association, Inc., of which they formerly were members. The former unit owners assert *1184 the claim was assigned to them and the putative class days before they and all other Ocean Beach Condominium unit owners sold their units in bulk to Sunny Isles Resort Developer, LLP. Citizens and Sunny Isles successfully argued below that any such assignment contravened the Declaration of Condominium and Articles of Incorporation of the Association. I agree and therefore would affirm the order of the trial court.
FACTS
This case arises out of hurricane damage to the Ocean Beach Resort Condominium, caused by Hurricane Wilma on October 26, 2005. Before the hurricane, the interve-nor, Sunny Isles Resort Developer, LLP, offered, through intermediaries, to purchase all sixty-six units comprising the condominium, intending to demolish the building and replace it with a luxury highrise edifice. Forty-five unit owners signed contracts before the storm and twenty-one signed sale contracts after the storm. A simultaneous closing on the sale of all sixty-six units occurred on April 17, 2006. No unit owner received less than the initial price offered by Sunny Isles prior to the storm; all unit owners who signed sale contracts prior to the storm received their full contract prices, without any reduction for damage caused by Hurricane Wilma.
Before the storm, Citizens Property Insurance Corporation issued a windstorm policy of insurance, effective April 10, 2005, to April 10, 2006, under which the sole named insured was Ocean Beach Condominium Association, Inc. The policy provided coverage for the buildings and common elements, but excluded property contained within a unit unless the Condominium Declaration required the Association to insure it. The Declaration required the Association to purchase casualty insurance only, “insuring all of the insurable improvements within the Condominium, including personal property owned by the Association.” Thus, no property owned by a putative class member is insured under the policy.
Subsequent to the storm, a public adjuster, retained by the Association, determined the property suffered $1,882,565.55 in covered losses and submitted a claim in that amount. Before the closing on the units occurred, Citizens paid $895,155.36 on the claim to its insured, the Association, whose members at that moment consisted of the selling unit owners. A dispute quickly ensued between the selling unit owners and buyer, Sunny Isles, over entitlement to these proceeds and the right to any future claim which might be brought.
To consummate the deal, Sunny Isles consented to the distribution of the sum thus far paid by Citizens to the selling unit owners. By letter dated April 13, 2006, four days prior to the closings of all the units, then counsel for the Association, now counsel for the plaintiffs in this case,[5] advised the unit owners as follows with regard to this sum:
The [Condominium Association] Board has directed our law firm to disburse certain monies to its unit owners. As unit owners in Ocean Beach Resort Condominium, you are members of the Association and each have [sic] an interest in the proceeds held by the Association.
*1185 There are two categories of money to be disbursed. First, we are directed by the Board to disburse all monies collected from the Association’s Citizens insurance policy relating to benefits paid in connection with the 2005 Hurricane season, which amounts to $805,643.52 (“Insurance Proceeds”). Second, we are directed by the Board to disburse all proceeds held in reserve for capital improvements by the Association (the “Reserve”), while retaining certain funds in our Trust Account for possible additional legal fees and other related expenses in connection with our duties.
With regard to any future demands to be made to, or future monies to be received from Citizens, the April 13, 2006, letter advised the unit owners to discuss the matter with the buyer:
We are told by counsel for the [buyer] ... that some of the unit owners have surrendered their rights to their portion of the Insurance Proceeds to the [buyer], though the [buyer] does not object to the enclosed distribution of the Insurance Proceeds. However, there is an additional approximately One Million One Hundred Thousand Dollars ($1.1 Million) you may be entitled to under the Association’s Insurance policy (“Future Insurance Proceeds”) that is being contested by the [buyer’s] attorney.... To determine your rights to Future Insurance Proceeds, you should discuss the disposition of these possible future payments with the [Buyer] pri- or to closing, subject to the advice of your own attorney.
[[Image here]]
[I]f you have entered into an agreement with the Buyer to transfer your insurance Proceeds or Future Insurance Proceeds to the Buyer (whether you realize it now or not), you should immediately contact ... the attorney for the [buyer], and clarify your rights vis-a-vis the [buyer] to the enclosed monies— prior to closing. If these conditions are not agreeable, do not deposit these funds and instead return them to me. (first emphasis added).
Hours after this letter was sent to all unit owners, counsel for the Association and counsel for Sunny Isles Resort reached an agreement with respect to future proceeds from Citizens. Counsel for Sunny Isles confirmed the agreement in an e-mail that, according to the transcript of an evidentiary hearing held on the assignment issue, reads as follows:
I have spoken with my client. He’s agreed with the insurance proceeds. The association expecting to receive or when received will be disbursed to the selling unit owners, (sic) Greg [Grier, the real estate broker for the sale] no longer has to fear for his life. Again, I will tell you that your attitude and approach has played a significant part in my client’s decision. Thanks very much for that. He is out of the office on Friday for the [Passover] holiday, but I will provide a letter to that effect on Monday.[6]
*1186 Based upon this communication, the Association’s Board of Directors met the next day at Association counsel’s law office and allegedly executed an assignment of the right to prosecute any claim for future proceeds to the selling unit owners. Neither (the now former) Association counsel nor any selling unit owner or board member has been able to produce a copy of the assignment, board minutes, or any other document in support of this allegation.[7]
After an evidentiary hearing in which the court received the e-mail, the confirming correspondence from Sunny Isles Resort, and testimony from both former counsel for the Association and a former board member, the trial court:
ORDER[ED] AND ADJUDGE [D] that there is no ‘assignment’ of the Association’s right to sue Citizens to the Plaintiffs and other individual unit owners, that Plaintiffs (and all members of the class certified by the order dated January 13, 2009) lack standing to sue Citizens for all of the claims alleged in the Amended Complaint....
(emphasis added). The trial court then vacated the earlier entered class action order and involuntarily dismissed the plaintiffs amended complaint. I believe the trial court was correct to do so.
ANALYSIS
It is axiomatic that no class action can proceed unless there is a named plaintiff with standing to pursue the class action. Taran v. Blue Cross Blue Shield of Fla., Inc., 685 So.2d 1004, 1005-1006 (Fla. 3d DCA 1997). The requirement stems from this state’s judicially pronounced “case or controversy” rule.[8] Dep’t of Revenue v. Kuhnlein, 646 So.2d 717, 720 (Fla.1994) *1187 (“[E]xcept as otherwise required by the constitution, Florida recognizes a general standing requirement in the sense that every case must involve a real controversy as to the issue or issues presented”). To satisfy the requirement, the class representative must demonstrate that a case or controversy exists between him or her and the defendant, “and that this case or controversy will continue throughout the existence of the litigation.” Sosa v. Safeway Premium Fin. Co., 73 So.3d 91, 116 (Fla.2011). “[I]f none of the named plaintiffs purporting to represent a class establishes a requisite of a case or controversy with the defendant, none may seek relief on behalf of himself or any other member of the class.” Taran, 685 So.2d at 1006 (alteration in original) (quoting O’Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)); see also Ramon v. Aries Ins. Co., 769 So.2d 1053 (Fla. 3d DCA 2000); Courtesy Auto Group, Inc. v. Garcia, 778 So.2d 1000, 1002 (Fla. 5th DCA 2000).
Standing does not address the claim sought to be enforced or the merits of the case. Rather, the question is whether the party prosecuting the claim has “a sufficient stake in the otherwise justiciable controversy to obtain judicial resolution of that controversy.” Kumar Corp. v. Nopal Lines, Ltd., 462 So.2d 1178, 1182 (Fla. 3d DCA 1985). The doctrine also encompasses the equally important requirement the claim be brought by or on behalf of one who is recognized in law as a “real party in interest,” that is, “the person in whom rests, by substantive law, the claim sought to be enforced,” id. (citing Author’s Cmt. to Fla. R. Civ. P. 1.210, 30 Fla. Stat. Ann. 304, 306-07; 3A J. Moore, Moore’s Federal Practice, ¶ 17.02); see also Weiss v. Johansen, 898 So.2d 1009, 1011 (Fla. 4th DCA 2005). Although it might be necessary to examine elements of the causes of action contained in a complaint or amended complaint to have a framework within which to decide whether a party has sufficient interest in a decision to meet the standing threshold necessary to prosecute a class action, the focus of a standing inquiry always is whether the named plaintiffs are the persons in whom rest the claims sought to be enforced. Kumar, 462 So.2d at 1183. Applying these precepts to this case and a de novo standard of review, see Wheeler v. Powers, 972 So.2d 285, 288 (Fla. 5th DCA 2008) (“Orders of dismissal based on a lack of standing must be reviewed de novo.”), it is my view the plaintiffs in this case lack standing as a matter of law to pursue the claims they seek to prosecute against Citizens Property Insurance Corporation for two interrelated reasons.
A. The Declaration of Condominium Prohibits the Purported Assignment.
The trial court placed primary reliance for its decision that the insurance claim in this ease was non-assignable on paragraph 12.12 of the Declaration of Condominium. The provision reads as follows:
12.12 Association’s Power to Compromise Claim: The Association is hereby irrevocably appointed agent for each Unit Owner for the purpose of compromising and settling claims arising under insurance policies purchased by the Association and to execute and deliver releases therefor, upon the payment of claims.
(emphasis added). The majority construes this paragraph of the Declaration of Condominium to “speak[ ] only to the inability of a unit owner to revoke his or her grant of agency to the Association to compromise and to settle claims brought under policies purchased by the Association.” See Maj. op. at 5. Because the provision does not expressly prohibit the assignment by the *1188 Association of an insurance claim under a policy it purchases, the majority believes such a claim to be assignable. I believe the majority places too fine an interpretive point on the provision.
A Declaration of Condominium is the condominium’s “constitution,” which strictly governs the relationships among the unit owners and condominium association. Woodside Vill. Condo. Ass’n v. Jahren, 806 So.2d 452, 455 (Fla.2002). With that purpose in mind, the provisions of a Declaration of Condominium should, wherever possible, be given a meaning compatible with that a person of ordinary intelligence in the community might assign to the language. See Sw. Fla. Water Mgmt. Dist. v. Charlotte Cnty., 774 So.2d 908, 915-16 (Fla. 2d DCA 2001) (“[Wjords in a statute ‘must be construed according to their plain and ordinary meaning, or according to the meaning assigned to the terms by the class of persons within the purview of the statute.’ ”) (citations omitted). Applying this standard, it is apparent from the text of this provision that it is written in the grammatical imperative. It also employs one of the most muscular words in the English language, a derivative of the word “irrevocable.” The plain and ordinary meaning of “irrevocable” and “irrevocably” is “not capable of being revoked.” Merriam-Webster’s Dictionary of Law 268 (1996); see also Webster’s Ninth New Collegiate Dictionary 640 (1988) (“not possible to revoke”); Black’s Law Dictionary 744 (9th ed. 2009) (“irrevocable” means “committed beyond recall”). My reading of this provision, which I believe to be most consistent with the plain and ordinary sense of the provision itself, is that the power to compromise the claim against Citizens, settle that claim, receive payment for that claim, execute and deliver a release for that claim, or sue Citizens on that claim, once conferred on the Association could not be “revoked” or “recalled.” I find it implausible the drafters of paragraph 12.12 contemplated any other interpretation.
This interpretation of paragraph 12.12 of the Declaration is supported by reference to the interlocking paragraphs of the Declaration in which it is found. See WFTV, Inc. v. Wilken, 675 So.2d 674, 679 (Fla. 4th DCA 1996) (stating that “[a] statutory phrase should [ ] be viewed not only in its internal context within the section, but [also] in harmony with the interlocking statutes”). On this point, paragraph 3.04 of the Declaration serves to appoint the Ocean Beach Resort Condominium Association, Inc. as “the corporate entity responsible for the operation of the Condominium.” Paragraph 3.13 broadly defines the Association powers to include “the administration and management of the Condominium Property.” Paragraph 16.03 invests the power to “sue or be sued with respect to the exercise or non-exercise of its powers” upon “[t]he Association.” Paragraph 16.04 expressly states: “A Unit Owner does not have any authority to act for the Association by reason of being a Unit Owner.” Reading these provisions in pari materia with paragraph 12.12 of the Declaration, I believe the better — indeed, the legally compelled — reading of paragraph 12.12 of the Declaration of Condominium in this case is that the Association is “irrevocably” the sole arbiter of all things related to “the administration and management of the Condominium Property,” including insurance claims. I conclude the Association officers and directors had no authority to make an eleventh-hour assignment of any remaining insurance claim to the selling unit owners.
B. The purported assignment also contravenes the Association’s Articles of Incorporation.
If there is any doubt the purported assignment upon which the plaintiffs rely for *1189 their claim they have standing to pursue the claim in this case is ultra vires and of no legal effect, it is my view the following provision found in Article III, Section 2 of the Association’s Articles of Incorporation puts the matter to rest:
The share of a member in the funds and assets of the ASSOCIATION cannot be assigned, hypothecated or transferred in any manner except as an appurtenance to his Unit.
(emphasis added). In plain terms, Article III, Section 2 forbids the transfer of any Unit Owner’s share in the Association’s assets “in any manner except as an appurtenance to his Unit.”
The Association’s assets included the rights under the Policy issued to the Association, including the right to potential future monies Citizens might pay pursuant to the Association’s claim for storm damage, and the right to sue Citizens with regard to such claim. Paragraph 16.03 of the Declaration states “The Association may ... sue ... with respect to the exercise ... of its powers” including “the maintenance, management and operation of the Condominium Property.” Under Article III, Section 2 of the Association’s Articles of Incorporation, the plaintiffs and all other unit owners are barred from assigning, hypothecating or transferring their shares in the claim against Citizens or in any potential future insurance proceeds “in any manner except as an appurtenance to the Unit.” Yet, that is precisely what the plaintiffs contend they did. Plaintiffs claim they, as the Association’s former board, “assigned” the Association’s claim to the various unit owners, who then severed them from their respective units and transferred the remaining interests in the units to Sunny Isles while retaining the Association’s claim against Citizens. Plaintiffs’ “assignment” theory also contravenes Article III, Section 2 of the Articles of Incorporation. See Koplowitz v. Imperial Towers Condo., Inc., 478 So.2d 504, 506 (Fla. 4th DCA 1985) (where a board’s action contravenes the Articles of Incorporation, the act is ultra vires, and “could not take effect”).
The purported separation of the share of each unit in the claim against Citizens from the other rights and interests appurtenant to the unit also runs afoul other restraints placed by the Declaration of Condominium. In relevant part, the Declaration states as follows:
VIII. Restraint Upon Separation and Partition of Common Elements
8.01 The undivided share in the Common Elements which is appurtenant to a Unit ... shall not be separated from it and shall pass with the title to the Unit whether or not separately described.
8.02 The share in the Common Elements appurtenant to a Unit ... cannot be conveyed or encumbered except with the Unit....
8.03 The shares in the Common Elements appurtenant to Units ... are undivided, and no action for partition of the Common Elements shall lie.
Section 3.06 of the Declaration defines “Common. Elements” as “the portion of the Condominium Property not included in the Units.” The Association’s claim is for damage to the common elements, as the former unit owners freely admit. These three sections of the Declaration also prohibit the separation and partition of the undivided shares in the common elements appurtenant to a unit. The former unit owners “assignment” theory also contravenes these sections of the Declaration. For these additional reasons, the purported “assignment” is ultra vires and void.
Conclusion
The Declaration and the Articles of Incorporation “are interrelated documents.” *1190 See § 718.104(4)(k), Fla. Stat. (2005) (“The declaration must contain or provide for the following matters: ... The document or documents creating the association, which may be attached as an exhibit.). The purported “assignment” in this case violates both. I would affirm the dismissal order of the learned trial judge.

. The condominium documents provide that each unit owner is a member of the condominium association. On April 17, 2006, Sunny Isles Resort became the owner of all the units and thus, the sole shareholder of the Association. On that date, counsel’s representation of the Association effectively terminated, and counsel’s law firm formally undertook the representation of the plaintiffs (all of whom were former officers or directors of the Association) and the putative class.

. As promised by this e-mail, Sunny Isles Resort managing member, Hector Dasso, delivered a letter to counsel for the Association the following Monday morning. The letter read in relevant part:
In an effort to consummate the closing on the purchase of the 66 Units in the Ocean Beach Resort Condominium, the undersigned, as the purchaser of those Units, has agreed it will disburse any insurance proceeds received by the Association after today for 2005 hurricane damage to the current Unit Owners. This disbursement will be paid directly to the Unit Owners in equal proportion. If distribution is based on size of Unit, please advise us, but it has been our *1186 understanding that each Unit Owner receives an equal share.
The actual e-mail is not in the record submitted to this court.

. The opinion of the majority is unclear concerning whether the alleged assignment was made by the Association as constituted before the closing or whether Sunny Isles Resort promised to make such an assignment when or after it became the sole shareholder of the Association upon closing of the sale of all the units. It is clear from the testimony received at the evidentiary hearing on "the assignment issue” conducted by the trial court at the behest of all parties, that the position of the former unit owner plaintiffs was that the assignment was made by the Association Board of Directors as it was constituted before the closings. For example, former counsel for the Association — counsel for the plaintiffs here — testified:
Q: Was there a meeting?
A: Yes.
Q: Were all of the board members present?
A: I believe so.
Q: Do you recall where the meeting was? A: Probably my conference room.
Q: All right. And what happened during that meeting with regards to assigning the claim to those future proceeds? A: The board assigned the claims — I am sorry, assigned the rights of the association to those proceeds to the individual unit owners in light of the fact that they would no longer be owners of those units and that was the end of that.
The only other witness who testified, a plaintiff and former board member of the Association, similarly stated:
Q: Now, do you recall a final meeting pri- or to the closing? (emphasis added).
A: I do.
[[Image here]]
Q: Explain to us what happened at that meeting? What do you recall?
A: I remember we did two things. We assigned the rights to the claim to all the individual unit owners, and-when we got past that part David had drafted up a document that stated that we were no longer a board member, we were resigning in fact from the board of directors.

. Unlike the express statement of the requirement found in the United States Constitution, see U.S. Const, art. Ill, § 2, the Florida Constitution does not contain an express “case or controversy” rule.